# T & D Video, Inc.[1] *vs.* City of Revere & others.[2]

No. 05-P-109.

Suffolk. December 14, 2005. - June 8, 2006.

Present: Laurence, Kantrowitz, & Cowin, JJ.

*Constitutional Law,* Zoning, Freedom of speech and press. *Zoning,* Validity of by-law or ordinance. *Evidence,* Relevancy and materiality. *Civil Rights,* Attorney's fees. *Practice, Civil,* Attorney's fees, Costs. *Witness,* Expert, Fee.

At the trial of a civil complaint seeking a judgment declaring that the defendant city's adult entertainment zoning ordinances effected unconstitutional restrictions on expression under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, and seeking to enjoin the enforcement of those ordinances against the plaintiff, the owner of an adult video store, the judge properly excluded as irrelevant certain allegedly obscene videotapes from the plaintiff's inventory, where there was little doubt that the plaintiff's inventory also included material that was not obscene (and therefore constitutionally protected), and properly evaluated the ordinances under the standard applied to protected speech. [466-468]

In a civil action, the judge properly concluded that the defendant city's adult entertainment zoning ordinances effected unconstitutional restrictions on expression under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, and that the ordinances could not be enforced against the plaintiff, the owner of an adult video store, where the record supported the judge's finding that the ordinances effectively banned the plaintiff's communication in the city altogether. [468-474]

This court remanded to the Superior Court for further proceedings an award of attorney's fees and expenses granted pursuant to 42 U.S.C. § 1988 and G. L. c. 12, § 11I, where the number of hours for which compensation was sought was excessive and the reduction by the trial judge was inadequate to correct the overreaching, and where the employment of an imbedded rate without reference to the skills or experience of certain attorneys was questionable [474-481]; further, this court reversed the award of expert witness fees, where the evidence in the case did not warrant a finding in the plaintiff's favor under the Massachusetts Civil Rights Act, in that the defendants did not indulge in threats or intimidation with respect to the plaintiff or its proposed activities [481-484].

---

[1] Doing business as Moonlite Reader.

[2] Zoning board of appeals of Revere and the building inspector of Revere.

CIVIL ACTION commenced in the Superior Court Department on November 16, 1994.

The case was heard by *Ernest B. Murphy,* J., and a motion for attorney's fees and costs was also heard by him.

*Ira H. Zaleznik* for the defendants.

*Allen C.B. Horsley* for the plaintiff.

COWIN, J. The defendants appeal from a judgment of the Superior Court declaring that defendant city of Revere's adult entertainment zoning ordinances effect unconstitutional restrictions of expression under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, and enjoining enforcement of those ordinances against the plaintiff, T & D Video, Inc. The defendants appeal also from the Superior Court order awarding attorney's fees and costs to the plaintiff.

1. *Background.* We set forth certain underlying facts based on unchallenged findings by the trial judge, supplemented where appropriate by undisputed evidence in the record. We reserve for later discussion in connection with certain issues those facts that the parties do dispute. On September 2, 1993, Thaddeus Drabkowski, a shareholder of the plaintiff corporation, signed a lease on behalf of the corporation as tenant to occupy property at 55 American Legion Highway in Revere. Drabkowski and his fellow shareholder, Del Paone, intended to open at that location an adult video store to be called "Moonlite Reader IV." Drabkowski and Paone began renovating the premises to prepare the space for use as a video store, and visited the Revere city clerk in order to complete a business certificate.

When they requested the appropriate paperwork at the city clerk's office, Drabkowski and Paone were informed that in order to obtain a business certificate for a video store, they first would have to complete additional paperwork from the city solicitor's office. The additional paperwork was an "agreement" stating that no adult videos or related materials would be sold at the store. Drabkowski and Paone refused to sign the agreement, but notwithstanding their refusal, a business certificate dated September 14, 1993, was issued by the city clerk.

On September 16, 1993, the mayor of Revere submitted to

the city council a proposed "adult entertainment" amendment to the Revere zoning ordinance. This amendment was adopted by the city council on November 8, 1993, as §§ 17.08.065 through 17.08.069, and § 17.16.045, of the Revere zoning ordinance.[3] Section 17.16.045 provided:

> "Adult entertainment establishments, adult bookstore[s], adult videostore[s], adult motion picture theatre[s] and advertising signs or devices erected, constructed, placed, altered, converted or otherwise changed may be allowed by special permit in the I [general industrial] District in conformance with the following minimum criteria:

> "A. Adult Entertainment Establishments, adult bookstore[s], adult videostore[s], adult motion picture theatre[s] and advertising signs or devices may not be located less than 1000 (one thousand) feet from the nearest lot line of: each other; public or private nursery schools; public or private day care centers; public or private kindergartens; public or private elementary schools; public or private secondary schools; playgrounds; parks; conservation areas; churches; residential uses; and residential districts.

> "B. A 30 ft. wide landscaped strip shall be provided along the property line fronting a public or private way.

> "C. Adult Entertainment Establishments, Adult Bookstores, Adult Videostores, Adult Motion Picture Theatres and advertising signs or devices are to be limited to lots greater than 25,000 square feet but not more than 40,000 square feet.

> "D. Adult Entertainment Establishments, Adult Bookstores, Adult Videostores, Adult Motion Picture Theatres and advertising signs or devices may not be allowed within a multi-use building or building containing other retail or consumer uses.

---

[3]Sections 17.08.065 through 17.08.069, and § 17.16.045, will hereinafter be referred to as the "adult entertainment ordinances" or the "ordinances." Where necessary, distinctions may be made between the ordinances as adopted in 1993 and as amended in 1995 by referring to them as the "1993 ordinances" and the "1995 ordinances" respectively.

"E. All advertising signs and adult entertainment uses, adult bookstores, adult videostores, and adult motion picture theatres shall not be located within 100 ft. of a public or private way and must be set back a minimum of 100 ft. from all property lines.

"F. No adult use advertising sign shall contain any moving, flashing or animated lights, or visible moving or movable parts."[4]

These provisions effectively prohibited any adult establishments from operating in Revere because the combination of lot size restrictions and setback requirements rendered it virtually impossible for a structure to be built that did not violate the ordinances. See *T & D Video, Inc.* v. *Revere*, 423 Mass. 577, 582 (1996).

After renovations on the plaintiff's store had been completed, the store's landlord obtained a retail occupancy permit for the premises. On August 31, 1994, the plaintiff sought a sign permit for the store. The defendant building inspector of Revere denied the plaintiff's application for a sign permit because the store did not comply with the requirements of the adult entertainment ordinances. The denial for the sign permit also notified the plaintiff that its intended use was not permitted at its location. After this denial, the plaintiff appealed to the defendant zoning board of appeals of Revere, which affirmed the decision of the building inspector.

While that appeal was pending, the plaintiff instituted this action against the defendants pursuant to 42 U.S.C. § 1983; G. L. c. 12, §§ 11H, 11I; and G. L. c. 40A. In this proceeding, the plaintiff seeks a judgment declaring that the adult entertainment ordinances violate its rights under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution, by infringing impermissibly on its freedom of expression, together with an injunction prohibiting the enforcement of the ordinances with respect to the plaintiff's proposed adult video store. A judge of the Superior Court entered a preliminary injunction barring

---

[4]Sections 17.08.065 through 17.08.069 define terms used in § 17.16.045.

enforcement of the ordinances against the plaintiff's operation; the order granting the preliminary injunction subsequently was affirmed by the Supreme Judicial Court. See *T & D Video, Inc.* v. *Revere, supra* at 583.

Shortly after commencement of this action, but prior to entry of the preliminary injunction, the city administration submitted to the city council proposed amendments to the adult entertainment ordinances. The proposed amendments were adopted on May 1, 1995 (following entry of the preliminary injunction). The 1995 ordinances lowered the setback requirement for adult establishments from one hundred feet to thirty or fifty feet, depending on the type of establishment,[5] and revised the lot size requirements for adult video stores from 25,000 to 40,000 square feet to 16,000 to 66,000 square feet.[6] Otherwise, the adult entertainment ordinances largely remained unchanged from the 1993 version. More specifically, under the 1995 ordinances, adult uses remained limited to the I district (later renamed the technology enterprise district); still were required to be 1,000 feet or more from each other as well as from schools, churches, parks, playgrounds, conservation areas, residential uses, and residential districts; and still required a special permit in order to operate.

A jury-waived trial was conducted with respect to the 1995 adult entertainment ordinances. A different judge determined that the plaintiff had a constitutionally protected right to sell adult videotapes that were not obscene, and concluded that the ordinances infringed on this right. Crediting the plaintiff's expert witnesses, the judge found that the combination of the 1995 ordinances and applicable environmental regulations left only one site in Revere where the adult entertainment activity contemplated by the plaintiff would be permitted to take place. This site was 41 Lee Burbank Highway, which the judge found

[5]Under the 1995 ordinances, "adult entertainment establishments" and adult motion picture theaters are required to be set back fifty feet from any public or private way and all property lines; adult bookstores and adult video stores are required to be set back thirty feet from any public or private way and all property lines.

[6]Under the 1995 ordinances, "adult entertainment establishments" and adult motion picture theaters are required to be situated on lots from 22,000 to 66,000 square feet.

to be patently unsuitable for the operation of a retail business because it was part of a larger parcel, owned by Gibbs Oil Company, that was not subdivided and that was contaminated by petroleum. The judge found in addition that both the 1993 and 1995 ordinances specifically were directed against the plaintiff. Finding that the ordinances effectively banned the plaintiff's protected speech completely, leaving no reasonable alternative avenue of communication for the adult-based content at issue, the judge ruled that the ordinances were unconstitutional both as an impermissible prior restraint on speech and as an impermissible time, place, and manner regulation. He accordingly permanently enjoined the defendants from enforcing the adult entertainment ordinances against the plaintiff. Relying on 42 U.S.C. § 1988 and G. L. c. 12, § 11I, he ordered further that the defendants pay attorney's fees and costs in the amount of $915,027.

The defendants appeal on the merits and on the fee award. At the outset, they attack the decision of the trial judge to exclude from evidence eleven allegedly obscene adult videos drawn from the plaintiff's inventory, challenging his determination that obscenity was not an issue in the case. Next, the defendants assert that various findings made by the judge are not supported by the evidence, and that the legal conclusions regarding the constitutional validity of the ordinances that he based on such findings are erroneous. Finally, the defendants assert that the plaintiff's request for attorney's fees was so excessive that it should have been disregarded altogether or, in the alternative, that the award should be reduced. We affirm the judgment, which declared the ordinances unconstitutional as applied to the plaintiff and permanently enjoined their enforcement. We agree with the defendants that the award of attorney's fees and costs is excessive and thus vacate the order on the plaintiff's petition.

2. *Exclusion of videotapes.* The defendants offered in evidence a selection of eleven videotapes purchased at the plaintiff's store, arguing that the tapes were evidence that the plaintiff's speech was constitutionally obscene and therefore not entitled to protection under the First Amendment or art. 16. See *Miller* v. *California,* 413 U.S. 15, 25 (1973); *Commonwealth* v. *Trainor,* 374 Mass. 796, 798-799 (1978). The judge excluded

the tapes as irrelevant. The defendants claim that this was error, contending that the obscenity of the material determined the level of protection to which the plaintiff was entitled under the First Amendment and art. 16, and thus the level of scrutiny that should have been applied to the ordinances.

The question whether evidence is relevant is addressed to the sound discretion of the trial judge, and his decision will be reversed only for palpable error. See *McLaughlin* v. *Vinios*, 39 Mass. App. Ct. 5, 8 (1995). Because the regulatory effort at issue here applies to speech that is not obscene as well as to speech that is, we agree with the judge that the status of the individual items that are regulated is irrelevant. There was therefore no error.

While obscenity, as defined for constitutional purposes, is beyond the pale of First Amendment protection, adult entertainment that is not obscene is entitled to protection under both the First Amendment and art. 16. See *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 65 (1981); *Barnes* v. *Glen Theatre, Inc.*, 501 U.S. 560, 565-566 (1991); *Commonwealth* v. *Sees*, 374 Mass. 532, 537 (1978); *Cabaret Enterprises, Inc.* v. *Alcoholic Bevs. Control Commn.*, 393 Mass. 13, 16-17 (1984); *T & D Video, Inc.* v. *Revere*, 423 Mass. at 580. Adult entertainment entitled to such protection includes the showing of adult motion pictures that are not obscene, nude dancing that is not obscene, and the sale of adult videotapes that are not obscene. See *Schad* v. *Mt. Ephraim, supra*; *Barnes* v. *Glen Theatre, Inc., supra*; *Commonwealth* v. *Sees, supra*; *Cabaret Enterprises, Inc.* v. *Alcoholic Bevs. Control Commn., supra*; *T & D Video, Inc.* v. *Revere, supra*. Because the regulation of speech that is not obscene affects fundamental rights protected by the First Amendment and art. 16, the constitutionality of such regulation is assessed under a standard of either strict or intermediate scrutiny. See *Commonwealth* v. *707 Main Corp.*, 371 Mass. 374, 380 (1976); *Mendoza* v. *Licensing Bd. of Fall River*, 444 Mass. 188, 197 (2005). In contrast, by virtue of its unprotected status, the regulation of obscenity requires no scrutiny of the statute or ordinance under which such regulation takes place. That obscenity may be proscribed by the government is a given. Judicial inquiry is directed not at the government's constitutional power

to regulate, which is established, but rather at the question (often a difficult one) whether the material that the government seeks to regulate is in fact obscene in the constitutional sense.

Here, there seems to be little doubt that the plaintiff's inventory includes material that is not obscene. Were it to include obscene material as well, such a fact would, as the judge concluded, be irrelevant to an examination of the ordinances. Where the provisions of a regulation could affect both protected and unprotected speech, the regulation is evaluated under the standard applied to protected speech. See *Miller* v. *California*, 413 U.S. at 23-24; *Reno* v. *American Civil Liberties Union*, 521 U.S. 844, 874-875 (1997). This elevated standard is applied regardless of whether the challenged speech is actually protected; the pertinent question is whether the regulation *potentially* could infringe on constitutionally protected speech, not whether it actually does so. See *Schad* v. *Mt. Ephraim*, 452 U.S. at 66; *Mendoza* v. *Licensing Bd. of Fall River*, 444 Mass. at 199-201 & n.14.

In this case, the ordinances in question applied to all adult entertainment, including that portion of the plaintiff's offerings that is plainly not obscene. Because the ordinances affected speech that is not obscene, and therefore is constitutionally protected, the trial judge properly applied heightened scrutiny. If indeed there is obscenity within the plaintiff's inventory, the defendants may, if they deem it necessary, seek criminal or civil relief. See G. L. c. 272, §§ 28-31. They cannot, however, insulate these ordinances from judicial review, and the judge correctly excluded the allegedly obscene videotapes as irrelevant.

3. *Constitutionality*. "[R]egulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment." *Renton* v. *Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986). As had the judge who presided at the preliminary injunction hearing, the trial judge assumed that the ordinances were "content neutral" in that they were not adopted for the purpose of restraining speech on the basis of its content. See *T & D Video, Inc.* v. *Revere*, 423 Mass. at 581. While it is not altogether clear to us on this record that the defendants' response was not motivated by distaste for the

plaintiff's activities, we are content to proceed on the same assumption. If so, the defendants permissibly could adopt so-called "time, place, and manner regulations . . . so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Renton* v. *Playtime Theatres, Inc., supra* at 47. The government thus may take steps to regulate reasonably anticipated secondary effects of the plaintiff's activities, such as increased traffic, reduced property values, or impact on the character of a neighborhood. See *id.* at 47-50. However, a valid exercise of such authority presupposes that these reasons genuinely formed the basis for the government's action, see *T & D Video, Inc.* v. *Revere, supra* at 581, and that such exercise does not limit unreasonably alternative avenues of communication, see *Renton* v. *Playtime Theatres, Inc., supra* at 50, 53-54.

In the present case, the judge did not pause at the question whether the defendants had established the presence of a legitimate governmental interest in regulating secondary effects, commenting only that the parties contested "whether the secondary effects upon the community of [the plaintiff's] adult video (and associated use) store was primary in the motivation of the [c]ity of Revere in passing the [o]rdinances in question." Instead, he moved directly to consideration of whether the ordinances effectively removed all possibility that the plaintiff could operate within the municipality. In concluding that they did, he found that application of the ordinances, in conjunction with existing environmental regulation, precluded the plaintiff's activities in all but a single location, with that location otherwise being "patently unsuitable for the operation of a retail, non-petroleum product-related business." Thus, the ordinances could not be justified as a permissible time, place, and manner restriction. In addition, the judge determined "that the totality of the evidence demonstrates conclusively that Revere directed the ordinance specifically at [the plaintiff]." He accordingly ruled that because the ordinances effectively banned protected speech, they operated as an impermissible prior restraint.

The essence of the defendants' argument on appeal is that the judge's findings in these respects are not supported by the evidence, and that the unwarranted findings in turn led to er-

roneous application of constitutional principles. The defendants challenge particularly the findings that the plaintiff was the target of the ordinances and that the ordinances as applied left no area of the city in which the plaintiff legally could locate, thus unreasonably limiting alternative avenues of communication. If, the defendants' argument continues, these findings were wrong, then the ordinances qualified as reasonable time, place, and manner restrictions and did not effect an impermissible prior restraint.

The defendants attack the judge's finding that the adult entertainment ordinances were directed against the plaintiff. The finding seems well supported in the record, given evidence that the ordinances, in their proposed form, were submitted by the mayor to the city council two days after Drabkowski and Paone applied for a business certificate. There was in addition evidence provided by the building inspector that two councillors, after they learned of the plaintiff's proposed operation, stated that the ordinances would be adopted. However, even were the finding permissible, we are not persuaded that it is meaningful. If the plaintiff were the only entity seeking to operate an adult video store in Revere, ordinances regulating such operations could be said to target the plaintiff, but such a characterization would not render otherwise valid restrictions unlawful. Indeed, the motivation for a legislative enactment is generally irrelevant in assessing its constitutionality. See *Renton* v. *Playtime Theatres, Inc.*, 475 U.S. at 47-48, quoting from *United States* v. *O'Brien*, 391 U.S. 367, 383-384 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive"). While a political animus against an individual or his speech may have a bearing on whether resulting regulation is in fact content neutral, that is not an issue in this case, and unspoken legislative motivations do not appear to us to be relevant in assessing whether an ultimate legislative product is a permissible time, place, and manner restriction.

Deciding that the ordinances effectively banned the plaintiff's communications in Revere altogether, the judge determined that the ordinances effected an impermissible prior restraint on protected speech. Such a characterization follows inevitably

from a recognition that the plaintiff lawfully could not carry on its communicative activities at all and was thus subject to the most complete prior restraint of which a government is capable. The defendants challenge the finding that the ordinances precluded alternative avenues of communication as not supported by the evidence.

In this regard, the defendants argue that we should conduct an independent review of the judge's finding that the ordinances left no alternative sites on which an adult video store legally could operate because it is a "mixed finding of law and fact" which implicates constitutional rights. See *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 498-511 (1984). The plaintiff contends that independent review is not required because it is necessary only when the decision below limits a plaintiff's constitutional protection and not when the lower court confirms constitutional rights. See *Planned Parenthood Assn./Chicago Area* v. *Chicago Transit Authy.*, 767 F.2d 1225, 1228-1229 (7th Cir. 1985); *Daily Herald Co.* v. *Munro*, 838 F.2d 380, 383 (9th Cir. 1988); *Multimedia Publishing Co.* v. *Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 160 (4th Cir. 1993).[7] The Supreme Judicial Court has not addressed the issue, and we are not disposed to make the attempt to resolve it. We conclude that, even applying the more rigorous standard of

---

[7]It is clear that the independent review standard applies where the lower court's decision upheld a limit on expressive activity. See *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 567-568 (1995); *Planned Parenthood League of Mass., Inc.* v. *Bell*, 424 Mass. 573, 579-580, cert. denied, 522 U.S. 819 (1997). The Federal circuit courts of appeals currently disagree, however, on whether independent review should be applied to decisions affirming constitutional expressive rights. Compare *Planned Parenthood Assn./Chicago Area* v. *Chicago Transit Authy.*, 767 F.2d at 1228-1229 (Seventh Circuit holds that clear error standard and not independent review applies to lower court's decision restricting government's ability to exclude advertisements based on message); *Daily Herald Co.* v. *Munro*, 838 F.2d at 383 (Ninth Circuit applies clear error standard to determination that government unconstitutionally has restricted free speech); *Multimedia Publishing Co.* v. *Greenville-Spartanburg Airport Dist.*, 991 F.2d at 160 (Fourth Circuit applies clear error standard, not independent review, to decision declaring restriction on speech unconstitutional), with *Jones* v. *Heyman*, 888 F.2d 1328, 1330-1331 (11th Cir. 1989) (applying independent review to District Court judgment that restriction on speech was unconstitutional); *Brown* v. *Palmer*, 915 F.2d 1435, 1441 (10th Cir. 1990) (applying independent review where lower court declared restriction on speech unconstitutional).

independent review, the judge was justified in finding that the ordinances precluded adult video stores from operating anywhere in Revere.

Independent review requires that we examine the record to determine "whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 567 (1995). Here, we ask whether the ordinances left any reasonable alternative sites available where adult expression of the type engaged in by the plaintiff could be carried on in Revere. We conclude that they did not. It was reasonable for the judge to credit the testimony of the plaintiff's land use experts: certified land use planner R. Bruce McLaughlin, and Jonathan Witten, also a certified land use planner as well as an environmental engineer, an attorney, and a law professor. Both experts agreed that the adult entertainment ordinances, when combined with existing environmental restrictions, left only one land area in Revere available for adult entertainment, with that location likely contaminated with petroleum. In addition, the location is a portion of an otherwise undifferentiated, larger parcel that has not been subdivided. Furthermore, Frank Stringi, Revere's city planner, conceded at trial that there was no single lot in Revere, other than the aforementioned contaminated land area, on which an adult video store could open under the zoning ordinances without having to obtain either a variance or permission to subdivide from the Revere zoning board. There being no place in Revere that reasonably was available for the use contemplated by the plaintiff, it is clear that the ordinances operated so as to leave the plaintiff no alternative avenues of communication.[8]

In addition, regulations that require permits or licenses before

[8]It is not an answer that adult videos are found in the inventories of video stores in Revere that feature material other than adult material. The government may not infringe on the constitutional right of the plaintiff to speak in a particular way on the theory that others are delivering similar speech in a manner more to the government's liking. There is a "general rule . . . that the speaker has the right to tailor the speech . . . . Its point is simply the point of all speech protection, which is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, supra at 573-574.

there can be lawful expression are prior restraints. See *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 150-151 (1969); *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 223 (1990); *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 130 (1992). Prior restraints are presumptively invalid and are subject to facial challenges, but may be upheld if they meet constitutional requirements. See *FW/PBS, Inc.* v. *Dallas, supra*; *Forsyth County* v. *Nationalist Movement, supra.* Under the First Amendment, licensing requirements for adult entertainment are invalid prior restraints if they vest in a government official overly broad discretion to grant the license, if they fail to place a limit on the time within which the decision maker must decide whether a license shall issue, or if they are not subject to ordinary judicial review. See *FW/PBS, Inc.* v. *Dallas, supra* at 225-226; *Littleton* v. *Z.J. Gifts D-4, LLC*, 541 U.S. 774, 779, 781-82 (2004) (overruling *FW/PBS, Inc.* v. *Dallas, supra*, in part, by holding that ordinary judicial review procedures are adequate and expedited judicial review is not required for adult entertainment permitting requirements).

Even had we concluded that the Revere adult entertainment ordinances qualified as permissible time, place, and manner restrictions, the ordinances still may effect an unlawful prior restraint because they are susceptible to a construction that would permit a ban of even authorized adult uses unless a special permit is granted, while vesting unlimited discretion in the city council to grant or deny such a permit. Subsections (C) and (D) of § 17.16.045 of the 1995 ordinances list conditions that must be met before an adult use permit can be granted. Once those conditions are met, however, pursuant to § 17.48.080 of the Revere zoning ordinance, the city council still has discretion to grant or deny the permit by a two-thirds vote of its members. It is not at all clear that the city council must grant a permit request where the applicant has complied with the ordinances; rather, the city council appears to be free to withhold a special permit for an adult use for any reason. If so, the ordinances invite "illegitimate abuse of censorial power," and would impose impermissible prior restraints even if they were otherwise valid. See *Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 758 (1988).

In summary, we have assumed without deciding that the Revere adult entertainment ordinances are content neutral, and that they represent an effort by the municipality to combat anticipated secondary effects. We are satisfied on this record that the effect of such regulation, however, is to deprive the plaintiff of all locations within Revere in which it may operate both legally and practicably. As such, the ordinances fail a requirement of permissible time, place, and manner regulation, and effect an unlawful prior restraint upon protected expression. We accordingly conclude that the Superior Court judge properly permanently enjoined their enforcement against the plaintiff.

4. *Attorney's fees and expenses.* Pursuant to 42 U.S.C. § 1988 and G. L. c. 12, § 11I, the plaintiff applied for an award of attorney's fees and expenses totaling $1,209,585.33 ($1,093,626 in attorney's fees, $67,037.77 in expenses, and $48,921.56 in expert witness fees). That portion of the application that relates to attorney's fees seeks an award based on 4,082.8 hours of the time of various attorneys expended on the case from its inception through the Superior Court trial on the merits, including the preliminary injunction proceeding, the defendants' appeal to the Supreme Judicial Court of the preliminary injunction order, discovery, the summary judgment proceeding, and the eventual trial.[9] These events took place over a span of approximately eight years, although there obviously were periods of inactivity throughout.

The trial judge reduced the number of compensable hours to 3,100, finding "that there is a considerable element of unnecessary duplication in these time records, and that a substantial portion of such duplicative billing must be laid to the inefficiency of [the plaintiff's] counsel." He concluded that a reasonable rate was $280 per hour, which he derived by applying a weighted average of the rates charged by the plaintiff's lead counsel (which rates ranged from $250 per hour at the inception of the case to $400 per hour by the end of the Superior Court phase). The judge accordingly awarded attorney's fees of $868,000 (3,100 hours multiplied by $280 per hour), a figure that apparently absorbs out-of-pocket expenses other than expert

---

[9]The plaintiff seeks additional attorney's fees and costs in connection with the present appeal. See *Fabre* v. *Walton*, 441 Mass. 9, 10 (2004).

witness fees. He allowed an additional $47,027 for expert witness fees,[10] resulting in an overall award of $915,027.

The defendants appeal from the fee award on multiple grounds. They argue first that the fee petition should have been denied outright because it was unconscionably excessive. In the alternative, they contend that the plaintiff failed to satisfy its burden of establishing a reasonable hourly rate for the various attorneys who worked on the case, and that the hours billed to the matter were unreasonable even after the judge eliminated close to 1,000 of them. The defendants argue further that expert witness fees should not have been awarded because they are not authorized under 42 U.S.C. § 1988 in 42 U.S.C. § 1983 cases, and that such fees could not be awarded under G. L. c. 12, § 11I, because the defendants' actions did not constitute "threats, intimidation or coercion" as required for application of that statute. G. L. c. 12, § 11H, inserted by St. 1979, c. 801, § 1. The plaintiff counters that the fees and costs awarded by the trial judge were within his discretion, particularly given the adamant refusal of the defendants to compromise their position, even in the face of an adverse Supreme Judicial Court decision, and the resulting prolongation of the proceedings.

Section 1988 of 42 U.S.C. provides that the prevailing party in a civil rights action brought under 42 U.S.C. § 1983 may recover reasonable attorney's fees, subject to the discretion of the trial judge. That the plaintiff is the prevailing party here is not disputed. While the language of § 1988 is permissive, case law has established that awards of fees to prevailing civil rights plaintiffs are "virtually obligatory," *Gay Officers Action League* v. *Puerto Rico*, 247 F.3d 288, 293 (1st Cir. 2001), absent "special circumstances," *Hensley* v. *Eckerhart*, 461 U.S. 424, 429 (1983). A judge may deny in its entirety a request for an award of fees only if the amount that the prevailing party requests is so "unreasonable" and exorbitant that it "shocks the conscience," or if counsel makes no good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. See *Brown* v. *Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980); *Lewis* v. *Kendrick*, 944 F.2d 949, 958 (1st

---

[10]His decision does not disclose why the amount sought ($48,921.56) was reduced.

Cir. 1991); *Fair Hous. Council* v. *Landow*, 999 F.2d 92, 96 (4th Cir. 1993); *Scham* v. *District Cts. Trying Criminal Cases*, 148 F.3d 554, 558 (5th Cir. 1998).

We reject the defendants' contention that an award of attorney's fees should be denied altogether. In so concluding, we nevertheless are constrained to say that this fee request certainly approaches the outermost parameter that separates an acceptable application from one that "shocks the conscience." Nevertheless, having in mind the objectives of fee-shifting statutes in general and § 1988 in particular, which include the legislative interest in inspiring legal actions directed to the identification and elimination of civil rights abuses, we believe that it would be inconsistent with those legislative concerns to refuse to allow any attorney's fees at all on this record.

We turn, therefore, to an evaluation of the specifics of the application. In our view, the number of hours for which compensation is sought (4,082.8) is excessive by any rational standard, and the reduction by the trial judge to 3,100 hours is inadequate to correct the overreaching. We question as well the employment of an imbedded rate of $280 per hour as a reasonable rate without reference to the skills or experience of the attorneys who contributed 1,810.8 of the hours in question.[11]

Where the trial judge allows a fee petition to a prevailing party, the amount allowed must be reasonable. To determine what amount is reasonable, the court generally engages in a "lodestar" analysis, see *Hensley* v. *Eckerhart*, 461 U.S. at 433-437; *Gay Officers Action League* v. *Puerto Rico*, 247 F.3d at 295, the essence of which is the multiplication of the "number of hours reasonably expended on the litigation" by "a reasonable hourly rate." *Hensley* v. *Eckerhart, supra* at 433. In making this calculation, the court should consider the time counsel spent on the case exclusive of hours that are excessive, redundant, duplicative, or unproductive. See *id.* at 434; *Gay Officers Action League* v. *Puerto Rico, supra.* The rate applied to the reasonable hours expended should be the prevailing rate in the community, taking into account the experience and qualifica-

---

[11]The figure of 1,810.8 hours is derived by subtracting the hours attributed to lead counsel (2,272) from the total hours for which compensation is sought (4,082.8).

tions of the attorneys involved. See *Gay Officers Action League* v. *Puerto Rico, supra.* The fee applicant bears the burden of documenting in detail the hours expended and of establishing the market rate. See *Blum* v. *Stenson,* 465 U.S. 886, 898 (1984); *Grendel's Den, Inc.* v. *Larkin,* 749 F.2d 945, 952 (1st Cir. 1984). After making its initial calculation, the court then may adjust the fee upward or downward based on other considerations, including the results obtained. See *Hensley* v. *Eckerhart, supra* at 434-435. Massachusetts cases governing attorney's fees awards reflect similar considerations. See *Linthicum* v. *Archambault,* 379 Mass. 381, 388-389 (1979); *Fontaine* v. *Ebtec Corp.,* 415 Mass. 309, 325-326 (1993).

With these criteria in mind, we consider the nature of the case and the legal services reasonably required. Lead counsel for the plaintiff, H. Glenn Alberich, is a well-known, experienced practitioner with respect to the First Amendment and its application to government action that may have an impact on protected expression. His hourly rates presumably reflect the demand for his services and the amount clients are willing to pay for his representation. Furthermore, it is reasonable to assume that both he and his law firm market themselves as a place to go on First Amendment questions because of Mr. Alberich's expertise and reputation.

The counterpart to such skills, and the increased compensation that they command, is that a client (and by extension, an opposing party subject to a fee award) should receive the benefit of the attorney's expertise in the form of at least some reduction in the amount of time that an attorney of lesser experience with the subject matter would have to expend. This is particularly so in this case. Insofar as the governing law is concerned, nothing decided in the Supreme Judicial Court, in this court, or in the Superior Court is new. Principles governing adult entertainment zoning and its First Amendment implications effectively were established well before this case was commenced. See *Renton* v. *Playtime Theatres, Inc.,* 475 U.S. at 47-48. While the subject certainly is not simple, and application of the relevant law can be complicated, attorneys who hold themselves out as experts in the field presumably already have overcome the difficulties that would require considerable study and preparation by less experienced counsel.

It is for these reasons that we are mystified by the number of hours for which compensation is sought. While the trial judge made a real effort to remove various redundancies, we think that that kind of fine probing of individual entries in the time records may, as it often does with large fee applications, have missed the forest for the trees. We believe that, at least in this case, the application is evaluated more effectively by examining the various component parts.

The plaintiff seeks approximately $100,000 for the preliminary injunction phase of the case in Superior Court, an amount that, while perhaps not intolerable, is high for the effort reasonably required. Furthermore, we are not inclined to award any fees for the appeal to the Supreme Judicial Court of the preliminary injunction order. That court awards attorney's fees where appropriate in its own cases, and has procedures for doing so. See *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004). There is no mention of a fee award in the Supreme Judicial Court's decision, see *T & D Video, Inc.* v. *Revere*, 423 Mass. at 583, and any request for fees in connection with that appeal should have been submitted there. Thus, the amount sought for the appeal of the preliminary injunction order (an additional $100,000) should have been rejected.[12]

Following the entry of the preliminary injunction and the affirmance thereof, there was an extended period of discovery. For discovery conducted between October, 1996, and November, 1999, the plaintiff seeks reimbursement for approximately 365 hours, generating bills of more than $100,000. By October, 1996, the hearing on the preliminary injunction prayer had been conducted in the Superior Court and that court's order had been affirmed by the Supreme Judicial Court. That means that there already had been considerable development of the factual positions and the supporting evidence of the parties, particularly on the plaintiff's part, to establish the likelihood of success on the merits, a critical element in a request for preliminary injunctive relief. The plaintiff has not satisfied its burden of demonstrating that the extent of discovery for which it was responsible during

---

[12]We make no comment on the merits regarding a charge of almost $100,000 to defend an appeal of an order granting a preliminary injunction.

the subsequent three-year period was justified by the reasonable requirements of litigating this case.

Subsequently, between November, 1999, and January, 2002, the plaintiff's attorneys billed over $300,000 for which they seek reimbursement in connection with the prosecution of a motion for summary judgment. While the plaintiff may have been encouraged to seek summary judgment by virtue of its success in obtaining a preliminary injunction and in the appeal therefrom, it is also a fact that the defendants already had amended the adult entertainment ordinances in an effort to meet some of the deficiencies on which the earlier version had failed. Cases of this nature are often fact-specific because the ways in which a given zoning ordinance affects the rights of given property owners or users will vary with circumstances and frequently will be the subject of good faith disputes. Summary judgment for the plaintiff, while perhaps not impossible, see *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), was a longshot, and eventually was denied. We are not prepared to award fees exceeding $300,000 for a summary judgment motion that involved legal principles well known by the plaintiff's attorneys, as well as facts that already had been tried in large part in the preliminary injunction proceeding, where that motion had a questionable likelihood of success from the beginning.

Over and above the amount sought for the preliminary injunction phase of the case, together with the amounts sought for defense of the defendants' appeal of the injunction order, discovery, and the summary judgment proceeding, the plaintiff seeks more than $500,000 for the preparation for, and the conduct of, a jury-waived trial that consumed less than four full trial days and that traversed much of the ground already covered during the preliminary injunction hearing. We have not been shown anything that comes close to an explanation why professional services reasonably required in connection with the trial called for an expenditure of one-half of $1 million.

The plaintiff defends the fee application in part on the basis of the judge's finding that the defendants' conduct was "obstructionist," and that the defendants unduly prolonged the litigation. If that is so, such tactics will result in an increase in

the number of hours that the adverse party reasonably must expend in order to prevail, and accordingly will bring about an increase in the amount of fees awarded. Contumacious behavior by a defendant does not call automatically for a premium over and above the number of additional hours that such behavior has made reasonably necessary. Furthermore, had the defendants'· conduct been truly obstructionist, the plaintiff had an available remedy under G. L. c. 231, § 6F, which it could have pursued in the Superior Court but did not. The plaintiff justifies its position also by assigning weight to the fact that it has not sought compensation for an additional 452.5 hours, valued at $150,626.50, that it voluntarily removed from its application. The simple answer to that is that the forgoing of an opportunity to make an excessive fee request even more excessive is hardly a defense to an overreaching application. Finally, the plaintiff points to the eight-year life of the case from its inception to the trial on the merits. As we have indicated, the length of the case is reflected in the number of hours reasonably devoted by counsel, and does not require the addition of a premium.

Addressing the subject of an appropriate hourly rate, the record shows that the plaintiff's lead counsel, responsible for 2,272 of the 4,082.8 hours for which fees are sought, charged between $250 and $400 per hour at various stages of the proceeding. Affidavits of attorneys knowledgeable with respect to the local culture regarding fees charged in civil rights cases supported these rates, the judge implicitly accepted them, and that finding is warranted. By contrast, the plaintiff offered nothing regarding the levels of skill or experience of the remaining attorneys responsible for 1,810.8 of the hours set forth in the application. We know nothing of their years in practice, the kind of practice in which they have been engaged, their experience in this kind of litigation, or anything else that might guide us in determining appropriate hourly rates for their services. If inexperienced with regard to the subject matter, they were not entitled to educate themselves at the expense of the client (or, as in this case, the adversary). See *Matter of Fordham*, 423 Mass. 481, 490 (1996), cert. denied, 519 U.S. 1149 (1997). The judge dealt with the problem by deriving an over-all average hourly rate of $280 and applying it across the board to everything, including both

the work of lead counsel and the work of all other attorneys. While this has the virtue of a rough-and-ready simplicity that fortuitously may do justice, we prefer an approach, at least in a case of this nature where lead counsel is such a significant figure in the process, that separates the rate awarded to lead counsel from the rate or rates awarded to others.[13]

We consider the problem of applying these considerations to the actual fee application. There is some precedent for making the determinations ourselves based on our familiarity with the record and our awareness of prevailing standards in the relevant legal community. This practice is often followed in the Federal courts. See *Lipsett* v. *Blanco*, 975 F.2d 934, 943-944 (1st Cir. 1992); *Gay Officers Action League* v. *Puerto Rico*, 247 F.3d at 299. However, we believe it to be the better practice in normal circumstances to remand so that the matter can be reconsidered by the trial judge. That judge, having presided at the trial and related proceedings, is in a superior position to undertake the evaluation of legal services rendered and to make the specific findings. The judge shall be free to act on the present record or to seek amplification of it as he sees fit.

5. *Expert witness fees.* We are left with the question of how to treat the expert witness fees for which the plaintiff seeks reimbursement of an additional $48,921.56. The judge recognized that expert witness fees in cases under 42 U.S.C. § 1983 are not allowable costs under 42 U.S.C. § 1988 beyond the level set forth in 28 U.S.C. § 1821(b). See *Crawford Fitting Co.* v. *J.T. Gibbons, Inc.*, 482 U.S. 437, 444-445 (1987). Such fees may be reimbursed under the Massachusetts Civil Rights Act (Act), and the judge did so (allowing $47,027). See G. L. c. 12, § 11I. The defendants contend that this award was impermissible because the plaintiff did not make claims under the Act, the case was not tried on that theory, and the judge erred in any event in determining that the defendants had violated the Act. We pass the first two grounds because we

---

[13]In arriving at his fee award, the trial judge folded the plaintiff's expenses (apart from expert witness fees) into the total. We believe that the plaintiff is entitled to separate reimbursement for expenses reasonably incurred. Its application sets forth a total of out-of-pocket expenses apart from those associated with expert witnesses of $67,037.77. On remand, the trial judge should determine which of these expenses should be reimbursed.

conclude that the evidence did not warrant a finding in the plaintiff's favor under the Act, and thus expert witness fees could not be awarded.

To recover under the Act, the plaintiff had to prove "that (1) [its] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. 390, 395 (1996), citing G. L. c. 12, § 11I. Economic pressure employed to "coerce individuals to forgo the exercise of their secured rights" constitutes coercion for purposes of the statute. See *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 647 (2003). Whether a municipality is susceptible to suit under the Act has not been decided definitively. We have held that a municipality is not a "person" for purposes of the Act. See *Howcroft* v. *Peabody,* 51 Mass. App. Ct. 573, 591-592 (2001). Earlier cases in the Supreme Judicial Court and in this court, while concluding on the records presented that there was insufficient proof of threats, intimidation, or coercion to justify findings for the plaintiffs, implied that, were the evidence otherwise, liability might lie against the municipality or municipal agency. See *Freeman* v. *Planning Bd. of W. Boylston,* 419 Mass. 548, 564-566, cert. denied, 516 U.S. 931 (1995); *Murphy* v. *Duxbury,* 40 Mass. App. Ct. 513, 518-519 (1996). In *Swanset Dev. Corp.* v. *Taunton, supra* at 396, the Supreme Judicial Court left the question open.

We need not attempt to resolve the issue for present purposes. Even assuming that there can be liability on the part of the defendants under the Act, such a finding could not be made on this record. There was no evidence that the defendants indulged in "threats" or "intimidation" with respect to the plaintiff or its proposed activities. Thus, the question is whether there was evidence of "coercion," and we conclude that there was not.

The matter appears to be controlled by *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington,* 399 Mass. 771, 781 (1987), where, in connection with an unlawful taking of the plaintiff's property, the court ruled that the Act did not apply.

"[T]he taking did not itself interfere or attempt to interfere with the plaintiffs' rights by coercion. The taking was an attempted direct, preemptive act and did not seek to coerce any plaintiff to do or not to do anything. Legislation, even unlawful legislation, lacks any quality of coercion when that legislation seeks to eliminate the rights of a person and does not seek to force that person unwillingly to do or not to do something otherwise lawful." *Ibid.* See *Longval* v. *Commissioner of Correction*, 404 Mass. 325, 333 (1989) ("A direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act"). Here, the record lacks sufficient evidence of an "animus against the plaintiff[] or [its] project . . . unrelated to [the defendants'] legitimate concerns." See *Murphy* v. *Duxbury, supra* at 518. There being no liability in this case pursuant to the Act, it follows that there can be no award of expert witness fees thereunder.

We add a final observation on the subject of awards of attorney's fees and costs. The economics of the practice of law are complex. The increasing levels of revenues required to sustain the operations of lawyers and law firms, some unavoidable, some perhaps self-inflicted, directly influence hourly rates and the services performed. If attorneys are able to command those revenues by means of arm's-length contractual arrangements entered into with their own clients, so be it. They cannot, however, expect routinely to receive them in fee awards entered against opposing parties. The case of *Lewis* v. *National Shawmut Bank*, 303 Mass. 187, 191 (1939), is old, but its words are timely:

> "The power of a court . . . to require payments out of the property of litigants to or for the benefit of counsel who may not have been employed by those whose estates are thus diminished and who may have opposed the latter's interests is a power of great delicacy to be exercised with extreme caution. It is difficult to conceive of anything more likely to undermine public respect for the administration of justice than a wide spread suspicion that the courts are aligned in aiding the distribution among counsel of excessive proportions of the funds of those who are unfortunate enough to become involved in controversy."

As the prevailing party on the substantive issues involved in this appeal, the plaintiff also is entitled to an award of reasonable appellate attorney's fees and costs. In accordance with the procedure in *Fabre* v. *Walton*, 441 Mass. at 10-11, the plaintiff may file an application therefor within fourteen days of the rescript of this opinion. The defendants will have fourteen days to respond to the application.

6. *Conclusion.* The judgment that permanently enjoins enforcement of the ordinances at issue against the plaintiff is affirmed. We vacate the order on the plaintiff's petition for attorney's fees and costs and remand for further proceedings consistent with this opinion.

*So ordered.*