NICHOLAS J. DeSANTIS *vs.* COMMONWEALTH ENERGY SYSTEM
& another.[1]

No. 06-P-538.

Worcester. December 14, 2006. - April 26, 2007.

Present: LENK, ARMSTRONG, & CYPHER, JJ.

*Contract,* Performance and breach, Employment. *Damages,* Breach of contract, Interest. *Labor,* Wages, Failure to pay wages. *Federal Preemption. Statute,* Federal preemption. *Employee Retirement Income Security Act. Employment,* Employee benefit plan. *Judgment,* Interest. *Practice, Civil,* Interest.

In an action brought by an employee against a former employer, alleging breach of contract and violation of the wage act, G. L. c. 149, § 148, arising from the employer's failure to pay commissions to the employee for his securing contracts for the sale of natural gas, the judge did not err in denying the employer's motion for judgment notwithstanding the verdict (or, in the alternative, for a new trial), where the evidence supported the judge's conclusion that an agreement existed to pay commissions to the employee upon his sale of a supply contract, and not at some later date [763-766]; further, the evidence was sufficient to support the judge's determination that the commissions fell within the scope of the wage act, and the judge did not abuse his discretion in trebling the damages under the act, given the employer's intentional and wilful violation of the parties' agreement and the employer's conduct showing a reckless indifference to the employee's rights [766-769].

In an action brought by an employee against a former employer, seeking pension-related damages arising from the employer's failure to pay commissions to the employee, there was no merit to the employer's argument that the claim was preempted by the Federal Employee Retirement Income Security Act of 1974, where the employee's claim did not require the interpretation of any retirement plan document [769-770]; however, the trial court judge erred in denying the employer's motion for judgment notwithstanding the verdict (or, in the alternative, for a new trial) insofar as it requested amendment of the award of prejudgment interest, where the interest had been improperly calculated on the present value of future lost pension benefits [770-772].

CIVIL ACTION commenced in the Superior Court Department on February 7, 2002.

[1]COM/Energy Marketing, Inc. (CEM Co.), a subsidiary of Commonwealth Energy System (System).

Claims for breach of contract were tried before *John S. Mc-Cann*, J.; claims for treble damages, loss of pension benefits, and attorney's fees were heard by him; and a motion for judgment notwithstanding the verdict was heard by him.

*Christopher Novello* for the defendants.

*Paul M. Stein* for the plaintiff.

CYPHER, J. This case arose from a challenge by the plaintiff, Nicholas J. DeSantis, to the method his former employer, COM/Energy Marketing, Inc. (CEM Co.), used in paying him commissions for his securing contracts (supply contracts) for the sale of "natural gas commodity." DeSantis's complaint contained two counts alleging breach of express and implied contract for severance benefits, and two counts alleging breach of express and implied contract for sales commissions. A fifth count alleged violation of G. L. c. 149, § 148 (the wage act), for nonpayment of commissions.

By agreement of the parties, the case was bifurcated. A jury trial was conducted to address the questions whether there was an agreement for a severance package, or "lifeline," and whether any commissions were owed. The jury were also asked special questions related to whether the commissions fell within the parameters of the wage act. The matters reserved for the jury-waived portion of the trial were whether any damages for lost commissions would be tripled pursuant to the wage act, whether the value of DeSantis's pension had been diminished, and attorney's fees.

After a seven-day trial in November, 2004, the jury determined that there was no lifeline severance agreement, but that CEM Co. was in breach of its employment contract with DeSantis. The jury awarded damages for commissions due of $79,598.10. Subsequently, the judge addressed the matters that had been reserved to him. Based on the jury's answers to special questions, the judge concluded that the wage act had been violated by the failure to pay commissions and, pursuant to G. L. c. 149, § 150, trebled the damages, to $238,794.30. The judge also found that, as a result of the commissions not paid, DeSantis suffered a loss of $42,841.56 in pension benefits from October 1, 2001, when he began receiving benefits, up to the date of trial. The present value of lost pension benefits from the

date of trial for the duration of DeSantis's life expectancy was determined to be $209,422.54. The judge thereafter ordered judgment for total damages of $491,058.48, and also awarded DeSantis attorney's fees of $60,932.10, and costs of $2,346.55.

The defendants submitted a combined motion for judgment notwithstanding the verdict (judgment n.o.v.); to amend the judgment; or alternatively for a new trial. The combined motion was denied by the judge on December 30, 2005. This appeal by both parties followed.

The defendants argue that the judge abused his discretion in denying their combined motion for judgment n.o.v. and other relief, principally claiming that (1) DeSantis was not owed further commissions; (2) the judge erroneously ruled that the wage act was applicable; (3) DeSantis's claim for pension damages was preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. (ERISA); and (4) the calculation of prejudgment interest was incorrect. In his cross appeal, DeSantis agrees that prejudgment interest was incorrectly determined and proposes an alternative calculation.

*Background.* In 1997, Commonwealth Energy System (System) formed CEM Co. to sell natural gas supply contracts to commercial and industrial customers in the market that resulted from the deregulation of the gas industry in the 1990's. DeSantis, who had been an employee of Commonwealth Gas Company (another subsidiary of System) since 1985, was offered a position in CEM Co. as a sales representative by Robert T. Bucknell, CEM Co. vice-president of sales. DeSantis accepted in July, 1997. During the course of his employment with CEM Co., DeSantis sold some seventy-five single- and multiple-year supply contracts. On February 23, 1999, CEM Co. was sold to Reliant Energy Retail, Inc. (Reliant), and DeSantis's employment with CEM Co. was terminated effective a few days later. DeSantis thereafter accepted employment with Reliant as a salesman.[2]

During his employment with CEM Co., DeSantis received monthly salary payments, but he received no commissions until October, 1998, followed by two additional payments, one in

---

[2]Reliant was sold to Amerada Hess Corporation in October, 2000, and DeSantis continued his employment with that company until June, 2003.

December, 1998, and another in June, 1999, after he had left CEM Co. Occupied with his sales work, and thinking CEM Co. would pay, DeSantis did not complain about the delayed payment of commissions.

Beginning in October, 1998, CEM Co. informed its employees that a buyer was being sought for the company. In that month, DeSantis was asked to meet with Victor DiNardo, director of human resources, and Carol Cormier, benefits administrator, to discuss the effect of the sale on his future employment. DeSantis was informed of benefits available upon termination; when he was told about company policy on severance payments, he said that it was not what he expected from earlier discussions with Bucknell. Particularly concerned that he had sold nearly seventy-five supply contracts for which commission payments had been delayed, DeSantis stated that those commissions had to be paid. DeSantis was told that his commissions would be paid only as long as he remained an employee of CEM Co. He testified that he did not recall what his response was, but that "I had a funny feeling in the pit of my stomach, to say the least." DeSantis contacted an attorney soon after that meeting.[3]

*Discussion.* We recite the familiar standard: "When acting on a defendant's motion for judgment notwithstanding the verdict, the judge's task, 'taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.' " *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), *S.C.*, 400 Mass. 224, cert. denied sub nom. *United Auto Wkrs., Local 422* v. *Tosti*, 484 U.S. 964 (1987), quoting from *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). "Conflicting evidence alone does not justify judgment notwithstanding the verdict. . . . The court may not

---

[3]After his termination from CEM Co. on February 26, 1999, DeSantis received a severance payment, but disagreed with the amount paid. He filed a complaint in the United States District Court for the District of Massachusetts on July 17, 1999, alleging noncompliance with ERISA and, after amending his complaint on April 13, 2001, alleging noncompliance with the wage act. Summary judgment was allowed for the defendants on the ERISA claims, and the pendent State claims were dismissed on January 8, 2002. DeSantis filed a complaint in the Superior Court on February 7, 2002.

substitute its judgment of the facts for that of the jury." *Tosti* v. *Ayik, supra.* It is unavailing for a defendant to argue that there was evidence warranting a contrary finding by the jury. *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.*, 381 Mass. 1, 4 (1980). "[W]e inquire . . . whether from the evidence it was possible to draw enough reasonable inferences to make out the elements of the plaintiff's case." *Hall* v. *Horizon House Microwave, Inc.*, 24 Mass. App. Ct. 84, 89-90 (1987), and cases cited.[4]

1. *Breach of contract — payment of commissions.* The defendants argue that there was no evidence of a contractual agreement to pay DeSantis's commission upon his sale of a supply contract rather than at a later date. The judge stated, "There was evidence from which the jury could reasonably conclude that, according to the terms of DeSantis'[s] employment, commissions were due and payable when DeSantis booked a sales contract." The judge also referred to evidence relating to the "nature of trading natural gas commodity futures" and "CEM Co.'s method of recording [supply] contracts and its calculation of commissions based on this method." Our examination of the evidence supports the judge's conclusion.

The terms of DeSantis's compensation were stated in a letter dated July 1, 1997, from John R. Williams, vice-president of COM/Energy Services Company. It confirmed the offer of a position made by Bucknell, and stated: "You will maintain your current base salary of $64,372 plus a commission equal to 20% of gross margins earned on sales of natural gas commodity."[5] It was DeSantis's contention that this language indicated that he would earn commissions upon the sale of a supply contract, and that the commissions were to be paid "up front," based on the "gross margin" determined at the beginning of the supply contract. DeSantis introduced the following evidence explaining

---

[4]The defendants moved for a directed verdict at the close of DeSantis's case, and renewed the motion at the close of all the evidence. Both motions were denied.

[5]DeSantis testified that, in his negotiations with Bucknell, he recognized the risk in leaving System to work for a new company in a highly competitive market and, accordingly, was concerned about pension and severance benefits, as well as maintaining the same base salary, supplemented with commissions.

how gross margins were determined in the sale of supply contracts for natural gas commodity in the unregulated market.

Sales in the unregulated market generally were made through longer term "requirements contracts" with larger commercial and industrial users. The customer obtained a fixed price for gas supplied for the contract term. CEM Co. purchased the gas for that term in the "energy futures market." Accordingly, a gross margin of profit could be determined at the beginning of the supply contract, and the contract had an "intrinsic value" which was "booked" in CEM Co.'s financial records and treated as an asset. The evidence established that "gross margin" was a term that had meaning only when determined at the beginning of a supply contract, and had no significance in how customers later were charged for the gas actually used.[6]

When DeSantis sold a supply contract, he prepared a worksheet containing data on quantities of gas sold, the cost to CEM Co., and the price to be charged the customer, all in the ordinary course of his duties. The gross margin was determined for each customer. At that time his work was completed and, DeSantis claimed, his commission had been earned. He performed no further work on those supply contracts. DeSantis also kept a summary of all the supply contracts he sold, based on the worksheets, from which he could determine the commission due him from the gross margin applicable to each sale. DeSantis began preparing the summary at the end of 1997 or the beginning of 1998. The defendants did not dispute any of the data in the worksheets or in the summary.

There was also no dispute over the meaning or significance to CEM Co. of "gross margin." According to Bucknell, gross margin is "the difference between the price we sold the gas at and what we actually paid for the gas." He also described a "booking" as "essentially a projection of revenue expectations from a sale of a contract," and stated that "[a] booking means[] it's on the books," i.e., the total value of a supply contract over its term has been entered in CEM Co.'s financial records.

---

[6]CEM Co. assumed the risk for any fluctuations in the market price of gas during the contract term. DeSantis testified, however, that a customer's actual use of gas would vary from a projected norm, and System was able to engage in daily trading of these variations in all of its supply contracts, to offset and potentially profit from these fluctuations.

According to Michael Collins, another sales representative, it was his understanding that commissions were earned when a supply contract was sold and executed by the parties, and commissions were paid at that point. He described the contract worksheet as the basis for how his commissions were paid.

According to Bucknell, after hiring the sales force, there were no discussions about how they would be paid, but there were discussions about when they would be paid. He agreed that it was their expectation that they would receive commissions regularly with monthly paychecks.

Bucknell testified that after calculating the gross margin on a sale, the "sales representative who signed that contract would be paid a percentage of [the gross] margin, and that payment would be made once the customer had received the gas and had actually paid . . . for the gas." Robert Paul, president of CEM Co., testified similarly, and also stated that commissions could not be paid earlier because, in accordance with CEM Co.'s business plan, it had to have cash flow to operate.

No one in the sales force was paid commissions for at least one year after CEM Co. began operations. Bucknell was sure that DeSantis and others were concerned that the commissions were not timely paid. Bucknell stated that a major reason for the delay was the unavailability of computer software to process payments, and that commissions could not be calculated until customer invoices and payments could be examined.

DeSantis never received any regular reports, documentation, or computer runs on his commissions. The commission checks he received in October and December, 1998, were not accompanied by any documentation.[7] It was not until June, 1999, that DeSantis saw any documentation indicating how his commissions were calculated and, in an exchange with DiNardo, disagreed with the amount presented; DeSantis subsequently accepted a different amount as partial payment.[8]

There was no error in the denial of the defendants' motion

---

[7]DeSantis testified that it was not until after he filed this action that he saw the documentation on these payments, introduced as exhibits at the trial.

[8]There is no merit in the defendants' assertion that DeSantis should be precluded, as matter of law, on the principle of accord and satisfaction, from recovering commissions prior to this, the last of the three payments made by

for judgment notwithstanding the verdict, as the evidence readily supported a finding that commissions were due and payable when DeSantis booked a sales contract.

2. *The wage act.* The defendants argue that the evidence was insufficient to support a finding that the wage act applied to DeSantis's commissions. General Laws c. 149, § 150, second par., as amended by St. 1999, c. 127, § 145, states in relevant part:

> "Any employee claiming to be aggrieved by a violation of section 148 . . . may, at the expiration of ninety days after the filing of a complaint with the attorney general . . . and within three years of such violation, institute and prosecute in his own name and on his own behalf . . . , a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney fees."[9]

General Laws c. 149, § 148, third par., as appearing in St. 1956, c. 259, is violated where an employer fails to pay commissions "when the amount of such commissions . . . has been definitely determined and has become due and payable to [an] employee."[10]

Special questions were developed for the jury, formulated to

---

CEM Co., because he wrote on the request for payment that, "[f]or the *period shown* [November, 1998 through February, 1999], I agree with the final commission payment" (emphasis original).

Whether there has been an accord and satisfaction is a question of fact which must be proved by the defendant. *Williams* v. *B & K Med. Sys. Inc.,* 49 Mass. App. Ct. 563, 569 (2000), and cases cited. The defendants fail to show that DeSantis's acceptance of this payment was anything other than an acceptance of a partial payment. The judge properly ruled on this record that DeSantis did not forfeit his claims for past due commissions, noting, inter alia, that DeSantis filed suit on those claims about a month after he received the partial payment in issue.

[9]It is not disputed that DeSantis made the obligatory filing with the Attorney General on January 18, 2001.

[10]The defendants assert on appeal that DeSantis should be precluded from recovering on commissions for supply contracts he sold before April 13, 1998, three years before the date his wage act claims were added to the complaint in the Federal District Court action. Their assertion is based on G. L. c. 149, § 150, second par. (employee aggrieved by violation of § 148 may institute a civil action "within three years of such violation"). There is no merit to this

address the elements of the wage act.[11] The jury were to determine the underlying factual grounds for the applicability of the act; that is, (1) whether DeSantis's commissions were "definitely determined" and "due and payable" at the time of the sale of a supply contract; (2) whether the commissions were a significant part of his compensation; and (3) whether the commissions should have been paid on a regular basis.

The jury answered "yes" to all of these questions, implicitly finding in addition that (1) DeSantis's commissions were determined on the basis of the gross margin calculated and booked at the time DeSantis completed his work on a supply contract; and (2) the offer of commissions was stated together with the salary offered DeSantis.[12] Accordingly, the jury's findings were sufficient to provide the factual underpinnings for the

argument. Under Fed.R.Civ.P. 15(c)(2), the wage act claims, which arose out of the same conduct, transaction, or occurrence as the severance claims, relate back to the original complaint filed in the Federal District Court on July 17, 1999. The wage act claims were thus timely filed, as the July, 1999, filing date is some two years after DeSantis began his employment with CEM Co. There is nothing in our record to indicate that DeSantis's amendment adding the wage act claims was disputed in that court.

After dismissal of DeSantis's pendent State claims he was entitled to renew them in the Superior Court within one year, and did so within one month. G. L. c. 260, § 32. See *Liberace* v. *Conway*, 31 Mass. App. Ct. 40, 45 (1991). Although the defendants asserted a general "applicable statute of limitations" affirmative defense in their answer to DeSantis's Superior Court complaint, there is no indication that the issue of the three-year limitation in G. L. c. 149, § 150, was pursued at trial. Similarly, it does not appear that the defendants pursued the issue in their postjudgment motion.

[11]It is apparent that the procedure and the special questions in this trial anticipated in significant respects the decision in *Wiedmann* v. *The Bradford Group, Inc.*, 444 Mass. 698 (2005), decided some eight months after the trial. In that case, the plaintiff sought commissions due under an oral employment contract. Because the dollar value of the commissions due the plaintiff was "arithmetically determinable," the court concluded that "the amount owed the plaintiff is definitely determined and, therefore, the weekly wage law applies." *Id.* at 708.

Also, in that case, the court commented that "nothing in the weekly wage law itself requires the weekly payment of wages," *id.* at 703-704, pointing out that G. L. c. 149, § 148, provides that certain employees may be paid at other intervals, including monthly. *Id.* at 704 n.9.

[12]The defendants complain that in answering one of the special questions, it was not clear at what intervals the jury found the commissions should have been paid, and it was not clear in answering another whether the jury found the commissions should have been paid "up front." To the extent that the jury's

judge's determination that the commissions fell within the scope of the wage act.

The jury found the defendants in breach of DeSantis's employment contract, and assessed damages of $79,598.10, the difference between DeSantis's calculation of the commissions due him of $139,033.40, and the $59,435.30 he had received.[13] The judge summarily trebled the damages to $238,794.30, relying on the language in G. L. c. 149, § 150, second par., that an employee may prosecute a "civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits."

Subsequently, in his memorandum of decision on the defendants' combined posttrial motion, the judge reconsidered the trebling of the damages in light of the decision in *Wiedmann* v. *The Bradford Group, Inc.*, 444 Mass. 698 (2005), decided some seven months after his January, 2005, decision (see note 11, *supra*). In *Wiedmann*, the court stated that "[b]ecause the plain language of [G. L. c. 149, § 150,] does not require a judge to award treble damages, we decline to create such a requirement and conclude that such an award is in a judge's discretion." *Id.* at 710. The *Wiedmann* court further stated: "Our conclusion is similar to the conclusion in *Goodrow* v. *Lane Bryant, Inc.*, 432 Mass. 165, 178-179 (2000), and cases cited . . . [, where t]he court stated that treble damages are punitive in nature, . . . and appropriate where conduct 'is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Wiedmann, supra.*

In reviewing the evidence in light of the decision in *Wiedmann*, the judge stated, "[I]t is clear that the award of treble damages in the instant case remains in this Court's discretion."

---

answers may have been inconsistent, they reasonably may be harmonized in light of the evidence, the issues, and the instructions, to conclude that the jury found DeSantis's commissions were earned at the time a supply contract was sold, and the commissions were expected to be paid regularly, along with the monthly payment of his salary. See generally *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 800 (1987); *Palriwala* v. *Palriwala Corp.*, 64 Mass. App. Ct. 663, 672-673 (2005).

[13]The jury awarded DeSantis no damages on the breach of contract claim for payment of the "lifeline" severance. He does not pursue the issue on appeal, and it is therefore waived.

He found that the defendants knew DeSantis was to receive commissions regularly but sought to excuse the lack of payments because of a shortage of funds resulting from the start-up of a new business, and because no automated financial system was available. The judge concluded, however, that because CEM Co. was managed by experienced employers such as Bucknell, and was a subsidiary of System, an established business, these reasons were without merit and the defendants acted in knowing and wilful disregard of DeSantis's rights.

The judge did not abuse his discretion in trebling the damages. Here, CEM Co.'s business plan placed a controlling priority in its favor on cash flow rather than paying commissions. Moreover, where the sale of CEM Co. inevitably resulted in cutting off full payment of DeSantis's commissions, there was an intentional and wilful violation of the parties' contract, and conduct showing a reckless indifference to DeSantis's rights.

3. *Alleged ERISA preemption of pension damages claim.* DeSantis, who had a "defined benefit" pension plan, alleged that his pension benefits had been reduced as a result of the failure to pay his commissions.[14] The claim was reserved as a jury-waived issue, and a hearing was held to determine the present value of the lost benefits.

The defendants argue that DeSantis's claim for pension damages was preempted by ERISA. They invoke the broad preemption language of ERISA with respect to a State cause of action "relate[d] to" an employee benefit plan. *Carlo* v. *Reed Rolled Thread Die Co.*, 49 F.3d 790, 793 (1st Cir. 1995). However, "[w]hen the resolution of state law claims will neither 'determine whether any benefits are paid' nor 'directly affect the administration of benefits under the plan,' the claims do not 'relate to' ERISA and accordingly are not preempted." *Pace* v. *Signal Technology Corp.*, 417 Mass. 154, 159 (1994), quoting from *Cuoco* v. *NYNEX, Inc.*, 722 F. Supp. 884, 887 (D. Mass. 1989).

The judge concluded that DeSantis's pension-related damages

---

[14]DeSantis's pension was based on the average of his last three years' annual compensation, including salary and commissions.

were not preempted by ERISA, noting that "DeSantis'[s] pension benefit was merely a measure of damages incidental to his state law claim for breach of contract," and that there was no need to interpret any retirement plan document in order to determine De-Santis's lost benefits. Rather, all that was required was an actuarial opinion to convert lost monthly benefits into a present value lump sum.

The parties each presented actuarial experts. DeSantis's expert, A. Rana Hosseini, whose analysis was adopted by the judge, testified that CEM Co. had already calculated DeSantis's benefits, and that he (Hosseini) went through the same steps, and identical methodology, to determine the additional benefits DeSantis would have received based on his compensation as increased by the commissions due. Hosseini's conclusion was that the benefit reduction due to omitted commissions was $42,841.56 from October 1, 2001, the date DeSantis began receiving benefits, to November 1, 2004, the beginning date of the trial.[15] A total present value of $209,422.54 was then calculated, from November 1, 2004, for DeSantis's life expectancy. The defendants do not dispute any of the results of the calculations.

We conclude, as did the judge, that because the present value determination was made by a facial, rather than substantive, reference to the pension plan, it was not preempted by ERISA. Compare *Leyland* v. *Plymouth & Brockton St. Ry. Co.*, 44 Mass. App. Ct. 427, 431 (1998) (claim for damages measured by face amount of life insurance policy not preempted by ERISA because claim did "not require an interpretation of the plan and ha[d] no effect on the liability of the plan as an entity or on the administration of the plan").

4. *Prejudgment interest.* The judge's memorandum of decision and order awarded DeSantis "such interest as may be allowed by law." The judgment entered by the clerk of court included prejudgment interest of $118,816.80, calculated from

---

[15]The $42,841.56 figure adopted by the judge for pension benefits lost from October 1, 2001, to November 1, 2004, was not the "present value," which Hosseini had calculated at $52,049.86 by increasing the $42,841.56 "with interest at twelve percent from the date of each [pension] payment when the payment was due." See part 4, *infra*, discussing prejudgment interest.

February 7, 2002 (the date the Superior Court complaint was filed), to January 31, 2005 (the date of the judgment). The interest was calculated on $331,862.20: $79,598.10 for lost commissions, plus $252,264.10 in diminished pension benefits, of which $42,841.56 is attributable to payments missed before the trial commenced, on November 1, 2004, and $209,422.54 is attributable to the present value of diminished pension benefits from November 1, 2004, through DeSantis's life expectancy.

The defendants argue that prejudgment interest was erroneously applied to the $209,422.54 present value of future lost pension benefits, and that the interest award should be modified accordingly. They also note that although this issue was raised in their postjudgment combined motion and memorandum, the judge did not address it in his decision on the motion. In his cross appeal, DeSantis agrees there was error in the calculation of prejudgment interest, but urges a different remedy.

It is a "fundamental proposition that interest is awarded to compensate a damaged party for the loss of use or the unlawful detention of money. This is the primary purpose of both G. L. c. 231, § 6B and § 6C." *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 390 (1988). Neither § 6B nor 6C, therefore, can "reasonably be said to apply to an award of damages based upon lost earnings and benefits occurring after the date of judgment." *Id.* at 391.

Here, the determination of the present value of lost future pension benefits was based, inter alia, on benefits lost after the date of judgment, and moreover, that determination inherently included the time value of the money lost. Accordingly, the present value determination must be excluded from the computation of prejudgment interest.

DeSantis argues that because the present value determination was made only "up to" November 1, 2004, prejudgment interest should be added from that date to the date of judgment, January 31, 2005. We disagree. DeSantis fails to recognize that the present value of the lost pension benefits was calculated commencing on November 1, 2004, and thus covered the period from November 1, 2004, through the date of judgment. An ad-

ditional award for prejudgment interest during that period would be duplicative.[16]

*Conclusion.* For the reasons given above, the judge properly denied the defendants' motion for judgment notwithstanding the verdict and did not abuse his discretion in denying the motion for new trial. Because prejudgment interest was improperly calculated on the present value of future lost pension benefits, it was error to deny the combined motion insofar as it requested amendment of the award of prejudgment interest.

The order denying the combined motion for judgment notwithstanding the verdict, to amend the judgment, or for a new trial is reversed as to the award of prejudgment interest. In all other respects the order is affirmed. So much of the judgment as awarded prejudgment interest in the amount of $118,816.80 is vacated. The judgment shall be modified to include prejudgment interest calculated on total damages of $122,439.66, consisting of lost commission damages of $79,598.10, plus lost pension benefits of $42,841.56. As so modified, the judgment is affirmed.[17]

*So ordered.*

---

[16]DeSantis also suggests, as options, that prejudgment interest could be calculated from (1) the date of breach associated with each supply contract; that is, the date when the gross margin basis for his commission was established for each supply contract he sold; or (2) the date his action was commenced in the Federal court.

We reject consideration of the first option because the trial in this case was not conducted on the ground urged by DeSantis. The jury made no findings on the date or dates of breach of contract, and DeSantis neither requested an appropriate instruction nor made any objection to the failure to give such an instruction. "If the date of breach or demand is not established, prejudgment interest is to be calculated from the date of commencement of the action. Establishing the date of breach or demand is a determination for the trier of fact, and, where trial has proceeded before a jury, neither the judge nor an appellate court can make such a determination." *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 125 (1986).

We do not consider the second option, because we are not aware of any controlling appellate authority supporting DeSantis's suggestion that prejudgment interest be calculated from the date of filing his complaint in the Federal court.

[17]DeSantis's request for attorney's fees and costs of this appeal is denied.