Troy, Paul E., J.
The plaintiff, Newly Wed Foods, Inc. (“NewlyWed”), brought an action based on breach of contract, breach of warranty, indemnification, and G.L.c. 93A, §11 against the defendant, Superior Nut Company, Inc. (“Superior Nut”). Newly Wed prevailed on breach of contract and breach of warranty claims. The juiy awarded $217,556.00 in compensatory damages. The jury also rendered an advisory verdict in NewlyWed’s favor on the G.L.c. 93A, §11 claim, determining that $435,112.00 would reasonably compensate Newly Wed for damages it suffered as a result of Superior Nut’s-willful or knowing, unfair or deceptive acts or practices.[1] Newly Wed’s §11 claim is now pending before the court.[2] For the reasons stated below, judgment will enter in Newly Wed’s favor in the amount of $435,112.00.
*603 FINDINGS OF FACT
The facts pertinent to Newly Wed’s G.L.c. 93A, §11 claim that are supported by the credible evidence presented at trial follows.
A.Contract for Sale and Deliveiy
Based on Newly Wed’s purchase orders and Superior Nut’s invoices, Superior Nut delivered 11,800 lbs. of toasted sesame seeds to Newly Wed between March' and August 2003, in nine separate shipments. Newly Wed’s purchase orders and Superior Nut’s invoices simply described the product delivered as “toasted sesame seeds.” Superior Nut delivered the toasted sesame seeds in twenty-five — pound boxes with plain labels, which read “TOASTED SESAME SEEDS” and the Superior Nut lot number, box weight, and date manufactured. These boxes did not display any allergen warning, disclosure, or declaration. Similarly, the other sales-related documents generated by Superior Nut only indicated that the product sold was “toasted sesame seeds” without further warning, disclosure, or declaration as to its potential peanut content. Newly Wed’s Plant Manager and QC Manager received the shipments and took small samples of each lot to compare them to those lots previously received.
B.Contamination and Adulteration of Toasted Sesame Seeds
The toasted sesame seeds delivered by Superior Nut to Newly Wed contained peanut. Newly Wed retained the samples collected by its Plant Manager and QC Manager and sent them to an outside laboratory for testing. Testing of the samples revealed that at least five lots of the toasted sesame seeds contained peanut. Newly Wed consequently tested the remaining boxed Superior Nut product and discovered the presence of peanut parts and skins. Newly Wed immediately decided to withdraw its product from the market due to the discovery.[3] Newly Wed concluded that Superior Nut was responsible for the peanut contamination and revoked its acceptance of Superior Nut’s adulterated toasted sesame seeds.[4]
C.Market Standards Relating to Products Adulterated by Peanut
Peanuts are a common allergen. The amount of peanut that is potentially dangerous to an allergic individual varies from person to person, but can be as little as .5 mg (1/1600 of a peanut). Therefore, the measure of dangerousness of undeclared peanuts in a food product to any individual consumer is based upon the amount (weight) of peanut which is ingested.
In 1996, the FDA sent a notice to manufacturers clarifying that manufacturers must label products that contain allergens because undeclared allergens in food pose a health hazard. The FDA stated that food with undeclared allergens is considered adulterated and misbranded. Starting in 2001, the FDA recommended that manufacturers having knowledge that their products contained peanut make declarations to consumers on their product labels such as “manufactured on shared equipment with peanuts.” In 2003, the FDA recommended that manufacturers disclose even inadvertant introduction of all levels of allergens, including peanut, and declare all ingredients on individual food product packaging. By this time, the FDA considered undeclared peanut of any level to adulterate a food product. Like the FDA, the food industry had also become concerned with allergens, such as peanut.
Based on these standards, NewlyWed’s expert testified that Superior Nut’s boxes should have been labeled “Toasted sesame seeds manufactured on shared equipment” and that the failure to affix this label to the boxes violated good manufacturing practices. Further, this expert opined that the toasted sesame seeds delivered to NewlyWed, which contained undisclosed peanut, were considered adulterated and misbranded by both the FDA and the food industry.[5] The court agrees with these conclusions.
D.The Parties’ Knowledge as to Peanut Contamination
Newly Wed was unaware that Superior Nut processed peanuts on the same line as sesame seeds until shortly after September 11,2003, when World Harbors discovered the contamination in its sesame-based sauce product.
Superior Nut’s Vice-President Justin Hintilian (“Hintilian”) testified during the trial that Superior Nut knew that the toasted sesame seeds delivered to Newly Wed contained peanuts and had for over ten years. Hintilian also admitted that he told an FDA inspector in 2003 that Superior Nut knew that trace amounts of peanut had been present in its toasted sesame seed product for years. Superior Nut knew that it could not guarantee that its toasted sesame seeds were peanut-free because they were produced on the same lines as peanuts and tree nuts, and the machinery on these lines collected peanut dust. Superior Nut only used low-cost compressed air blowing to ensure that the peanut dust did not collect on its equipment. This method was known to be ineffective for maintaining equipment completely free from dust. During trial, Hintilian stated that he was aware that the better practice was to warn customers regarding allergens and that Superior Nut actually used warning labels in products delivered to other customers. In fact, Superior Nut discontinued processing toasted sesame seeds after Newly Wed’s 2003 recall to avoid the cost of dedicating a single line for their manufacture.
Superior Nut therefore knew its toasted sesame seeds were adulterated by peanut when approached by Newly Wed about the source of the peanut contamination within the toasted sesame seeds. Instead of informing Newly Wed that the peanut derived from Superior Nut’s shared manufacturing lines, Superior Nut engaged in a cover-up by denying any knowledge *604 of peanut content and by denying Newly Wed access to its facility for testing purposes.
E. Damages Incurred as from Undisclosed Peanut Contamination
Newly Wed destroyed the seventy-nine boxes of adulterated toasted sesame seeds, the boxes of unused product returned from its customers[6] and the adulterated sesame seeds that it had incorporated in 2,500 lbs. of its own proprietary blends. Newly Wed paid B&G Food ($65,361.14 and $126, 208.56), Cain Foods ($59,125.06 and $109,019.12), and World Harbors ($11,237.00 and $21,461.04) in compensation after implementing a toasted sesame seed product recall. Newly Wed also claims that it incurred costs on testing, domestic air travel, and long-distance phone calls related to tracing the source of its peanut contamination.
RULINGS OF LAW
Newly Wed seeks a judgment declaring that Superior Nut engaged in a willful or knowing unfair or deceptive act or practice in violation of G.L.c. 93A, §11. Specifically, Newly Wed claims that Superior Nut breached its implied covenant of good faith and fair dealing as a result of its (1) fraudulent and deceptive manufacturing and labeling practices and (2) fraudulent misrepresentations concerning the source and nature of the contamination. Newly Wed seeks double or treble damages, along with compensation for attorneys fees and litigation costs. After review of the evidence, the court finds that Superior Nut engaged in a willful or knowing violation of §11 by failing to disclose that its product contained peanuts and by initially concealing the source of the peanut contamination. Newly Wed is entitled to double damages and reasonable attorneys fees and costs.
I. Unfair or Deceptive Act or Practice
General Laws c. 93A, §2(a) makes it unlawful to engage in “(u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.” General Laws c. 93A, §11 creates a private right of action for businesses, stating:
Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may . . . bring an action in the superior court... for damages and such equitable relief, including an injunction, as the court deems to be necessaiy and proper.
Section 11 also mandates that the unfair or deceptive act or practice occur “primarily and substantially” in Massachusetts; however, the burden of proof rests on the party challenging this requirement. G.L.c. 93A, §11.
Here, the court finds that Newly Wed satisfies the preliminary requirements for maintaining a § 11 claim, in that it engaged in “trade and commerce” and that it suffered a monetary loss.[7] Further, the parties do not dispute that Superior Nut’s challenged conduct occurred “primarily and substantially” in Massachusetts.[8]
The focus of the court’s inquiry is whether Superior Nut engaged in an unfair or deceptive act or practice. “(BJusinesses seeking relief under §11 are held to a stricter standard and a higher level of acumen than are consumers in terms of what constitutes unfair or deceptive conduct.” Lily Transp. Corp. v. Royal Institutional Serv., 64 Mass.App.Ct. 179, 205 n.14 (2005); see also Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983) (“One can easily imagine cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business”).
“Courts have deliberately avoided setting down a clear definition of conduct constituting a violation of G.L.c. 93A.” Id. at 616. The evaluation of whether conduct is “unfair” involves a fact-intensive inquiry, which considers “all the circumstances” of a business transaction. See Duclersaint v. Federal Nat’l Ass’n, 427 Mass. 809, 814 (1998); Stagecoach Transp. Corp. v. Shuttle, Inc., 50 Mass.App.Ct. 812, 187 (2001) (stating the court “should focus on the nature of the challenged conduct and on the purpose and effect of that conduct”); PMP Assocs. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975) (stating factors to consider, including whether act or practice falls under “some common-law, statutory, or other established concept of unfairness,” “is immoral, unethical, oppressive, or unscrupulous,” or causes substantial injury to consumers or business competitors). A court may find an act or practice “deceptive” if it “[can] reasonably be found to have caused a person to act differently from the way he otherwise would have acted.” Fraser Eng’g Co. v. Desmond, 26 Mass.App.Ct. 99, 104 (1988); see also USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct. 108, 125 (1989) (suggesting that failure to disclose information that would influence a buyer’s decision to enter into a commercial transaction may be “deceptive”). Cf Vmark Software v. EMC Corp., 37 Mass.App.Ct. 610, 620-21 (1994) (suggesting that misrepresentation does not have to be intentional to be “deceptive”).
In this case, the jury returned a verdict for the plaintiff on breach of contract and breach of warranty claims. A breach of contract can constitute unfair or deceptive conduct under §11; however, the law is clear — "(m]ere breaches of contract, without more, do not violate Chapter 93A." Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st. Cir. 1985); see also Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995); Community Builders, Inc. v. Indian Motocycle Assocs., Inc., 44 *605 Mass.App.Ct. 537, 559 (1998). However, a case involving a breach of contract may establish unfair or deceptive conduct where the circumstances indicate that the defendant: (1) violated the implied covenant of good faith and fair dealing, see Cherick Distribs. v. Polar Corp., 41 Mass.App.Ct. 125, 128 (1996); (2) made fraudulent misrepresentations, see Graves v. R.M. Packer Co., 45 Mass.App.Ct. 760, 768 (1998); or used the breach as leverage to gain an economic advantage' or other concession, see Clamp-All Corp. v. Foresta, 53 Mass.App.Ct. 795, 812-13 (2002), and cases cited. Similarly, whether a breach of warranty qualifies as an unfair or deceptive act or practices depends on whether the circumstances demonstrate more than a simple breach of warranty.[9]
Precedent discussing violations of the implied covenant of good faith and fair dealing is instructive here. Massachusetts recognizes an implied covenant of good faith and fair dealing in all contracts, which requires “that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471, 471-76 (1991) (finding §11 violation where plaintiff violated implied covenant of good faith and fair dealing by using pretext, withholding approval on crucial part of project, to force defendant to pay more than the amount agreed to in contract); Cherick Distribs. v. Polar, 41 Mass.App.Ct. 125, 128 (1996) (finding § 11 violation where manufacturer violated implied covenant of good faith and fair dealing by terminating exclusive distributor on only four day’s notice).
Newly Wed’s case cannot be classified as a simple breach of contract or warranty action. Here, Superior Nut engaged in a pattern of unfair and deceptive acts and practices, starting with the failure to disclose that its toasted sesame seeds contained peanuts and ending with its attempt to cover-up knowledge of this product’s peanut content.
Superior Nut first engaged in a commercially unfair practice by failing to disclose that its toasted sesame seeds were as being manufactured on equipment shared with peanuts and that they consequently contained peanut. By 2003, failure to disclose that a product contained peanut fell within a well-established concept of unfairness within the food industry. In 2001, the FDA recommended that all manufacturers clearly label all allergens contained in food products, including peanuts. By 2003, the FDA recommended that even inadvertently introduced allergens be disclosed by manufacturers of food products. Food containing an undisclosed allergen, in this case peanut, was considered adulterated or mislabeled. Superior Nut’s Vice-President knew that the toasted sesame seeds it sold contained peanuts, admitted that the better practice was to label individual boxes accordingly, and even revealed that the toasted sesame seeds sold to other consumers were labeled with allergen information. The court notes Superior Nut’s argument that the FDA and Massachusetts law did not mandate allergen labeling on individual containers until 2006. However, Chapter 93A protection extends beyond the confines of laws and regulations to established concepts of unfairness, which are defined by the relevant commercial standards in this case. Superior Nut’s failure to disclose that its toasted sesame seed product contained peanut was therefore unfair for Chapter 93A purposes. Superior Nut’s practice was also deceptive in the sense that lack of allergen information relating to peanut content was material to NewlyWed’s decision to purchase Superior Nut’s product.
Superior Nut’s commercially “unfair” conduct is not limited to its labeling practice, however. Despite knowledge that its toasted sesame seeds contained peanut from manufacture on equipment also used to process peanuts, Superior Nut resisted Newly Wed’s efforts to rapidly discover the source of its peanut contamination. Superior Nut’s employed this act to cover-up its inefficient peanut cleaning methods and to ultimately prolong Superior Nut’s contractual relationship with Newly Wed. In doing so, Superior Nut breached its implied covenant of good faith and fair dealing and continued to engaged in commercially “unfair” behavior.
II. Damages and Attorneys Fees
Newly Wed may recover multiple damages related to Superior Nut’s unfair and deceptive acts. See G.L.c. 93A, §11 (“If the court finds for the petitioner, the recoveiy shall be in the amount of actual damages; or up to three, but not less than two, times the amount . . .”).
As to actual damages, “(w]here injuiy is incurred because of conduct which comprises the elements of any common-law . . . cause of action and which is also a violation of the Consumer Protection Act, recovery of cumulative damages under multiple counts may not be allowed.” Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 235 (1984). “It is only where the same acts cause the same injuiy under more than one theory that duplicative damages recoveries will not be permitted.” Id; see also Szalla v. Locke, 421 Mass. 448, 454 (1995) (in the case of a duplicative award, plaintiff must elect from among the counts). Here, the jury awarded Newly Wed $217,556.00 in compensatory damages for its breach of contract and breach of warranty claims. The jury also advised the court to enter a judgment for twice that amount under §11. The verdict form did not ask the jury to specify the amount of actual damages awarded under §11 or whether the total award was duplicative of an injury under another legal theory for which Newly Wed recovered. However, by awarding the exact double of the combined damages for breach of contract and breach of warranty, the court infers that the jury found no separate §11 damages. The court agrees that Newly Wed has in *606 curred no additional damages due to Superior Nut’s unfair and deceptive acts and practices; thus, award of damages under both claims would be cumulative and NewlyWed must elect an awapd between counts. See Calimlim, 392 Mass. at 235 (preference is given to §11 award).
Where Newly Wed has incurred no separate damages from Superior Nut’s §11 violation and its actual damages are duplicative of its common-law claims, the court may still award double or treble damages. Cherick Distribs., Inc., 41 Mass.App.Ct. at 130 (court should use the amount awarded under the common-law claims for purposes of multiplying damages).[10] Such damages are justified where the defendant’s unfair or deceptive act or practice is a “willful” or “knowing” violation. See §11 (para 5, sent. 1); Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711 n.6 (1985) (a “knowing” violation requires proof that defendant knew that a fact it represented to be true is not true, whereas a “willful” violation requires proof that defendant acted with reckless disregard in representing a fact that it did not know to be true or false), citing Computer Sys. Eng’g, Inc. v. QantelCorp., 571 F.Sup. 1365 (D.Mass. 1983) (rev’d on other grounds).
Here, the Superior Nut’s Vice-President admitted that the business knew that the toasted sesame seed product contained peanuts. However, Superior Nut failed to affix allergen labels to its packaging or confirm the source of the peanut contamination in response to Newly Wed’s inquiry. The jury’s advisory verdict indicates that Superior Nut’s unfair or deceptive acts or practices were either willful or knowing and suggests the award of double damages, based on the inference that $435,112.00 equals twice the recovery under NewlyWed’s common-law claims. The court agrees, in its discretion, that double damages are warranted in the amount of $435,112.00 for the level of unfair and deceptive conduct in which Superior Nut engaged.
Section 11 also mandates the award of reasonable attorneys fees and costs to a prevailing business. The court is not required to apportion attorneys fees for the prevailing party’s Chapter 93A claims and non-93A claims, where both types of claims are based on the same chain of events. See Clamp-All Corp., 53 Mass.App.Ct. at 813 (2002). Here, all of Newly Wed’s claims arise from the same chain of events, and it is consequently entitled to recover reasonable attorney fees without apportionment. Similarly, NewlyWed may also recover reasonable costs for filing and service fees, expert fees, and costs for depositions. See Waldman v. American Honda Motor Co., 413 Mass. 320, 324 (1992) (“reasonable expert witness fees should normally be recoverable in a c. 93A case . . .”); Incase v. Timex Corp., 421 F.Sup.2d 226, 242-45 (2006).
ORDER
For the reasons stated above, Newly Wed is entitled to judgment in the amount of $435,112.00 for its G.L.c. 93A, § 11 claim, along with reasonable attorneys fees and costs. Superior Nut’s Motion for Judgment Notwithstanding the Verdict is also DENIED.

When the jury renders an advisoiy verdict, the judge remains free to draw his own conclusions from the facts presented at trial. See Augustine v. Rogers, 47 Mass.App.Ct. 901, 901 (1999).

Superior Nut’s Motion for Judgment Notwithstanding the Verdict is also before the court. With respect to such a motion, “the judge’s task, ‘taking into account all of the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the juiy reasonably could return a verdict for the plaintiff.’ ” DeSantis v. Commonwealth Energy Sys., 68 Mass.App.Ct. 759, 762 (2007) (citations omitted). Based on the evidence presented at trial, the jury reasonably returned a verdict for Newly Wed.

Newly Wed stated that it only sells peanut-free products and that it felt uncomfortable about having products on the market without adequate labels indicating potential peanut content.

World Harbors, a customer of Newly Wed, also discovered peanut parts and skins in the toasted sesame seeds originally from Superior Nut. Following testing, World Harbors learned that its Mandarin Sesame Crock and Cook Sauce also contained peanut.

As such, the jury reasonably found that Superior Nut’s toasted sesame seeds were not of fair and average quality and violated the implied warranty of merchantability.

Newly Wed distributed the Superior Nut toasted sesame seeds to third parties, including B&G Foods, Inc., Cains Foods, and World Harbors, Inc. in its original packaging with a Newly Wed label reflecting the information conveyed by Superior Nut without an allergen disclosure. These third parties returned their unopened product to Newly Wed and recalled products on the market.

G.L.c. 93A, §l(a) defines “person” broadly to include “natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.” Similarly, engaging in “trade or commerce” also has broad meaning, including the manufacture and sale of products. See G.L.c. 93A, §l(b).

In determining whether a case complies with §ll’s special requirement, the court focuses on “whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.” Kuwaiti. Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003); see also Auto Shine Car Wash Sys., Inc. v. Nice N’ Clean Car Wash, Inc., 58 Mass.App.Ct. 685, 689 (2003) (suggesting that the “center of gravity” tests involves evaluation of several factors, including the location of the deception or the resulting harm). Here, Superior Nut’s manufacture of the toasted sesame seeds, and its communications about the source of peanut contamination, occurred within Massachusetts.

“Generally, a breach of warranty constitutes a violation of G.L.c. 93A, §2"; Maillet v. ATF-Davidson Co., 407 Mass. 185, 193 (1990), and cases cited; however, the Supreme Judicial Court has stated that this rule does not apply to § 11 business cases. See Knapp Shoes v. Sylvania Shoe Mfg. Corp., 418 Mass. 737, 746-47 (1994) (breach of warranty is not per se 93A violation for §11 purposes).

Prejudgment interest, however, is calculated solely on actual damages. Makino, U.S.A. v. Metlife Capital Credit Corp., 25 Mass.App.Ct. 302, 320-21 (1988).