Josephson, Bertha D., J.
The plaintiff brought suit against the defendants, the Commonwealth of Massachusetts Executive Office of Transportation (“EOT’) and the Commonwealth of Massachusetts Registry of Motor Vehicles (“RMV”), for employment discrimination based on sexual harassment and retaliation in violation of G.L.c. 151B. After trial before a jury, a verdict was returned for the plaintiff on both counts against the EOT and RMV (collectively “the Commonwealth”). The jury awarded the plaintiff compensatory and punitive damages.
After trial, pursuant to G.L.c. 15 IB section 9, the plaintiff filed requests for attorneys fees and costs totaling $102,744,87. The defendants moved (1) to amend the judgment to correct a clerical error, pursuant to Mass.R.Civ.P., Rule 60(a), (2) for remittitur, pursuant to Mass.R.Civ.P., Rule 59(a), and (3) for judgment notwithstanding the verdict pursuant to Mass.R.Civ.P., Rule 50(b) or in the alternative for anew trial, pursuant to Mass.R.Civ.P., Rule 59(a).
BACKGROUND
The matter was tried before the Court to a juiy commencing on April 17, 2012, and ending with the juiy’s verdict rendered on April 30, 2012. The defendants moved for a directed verdict both at the close of the plaintiffs case and at the close of all the evidence on grounds that the plaintiffs evidence, when viewed in the light most favorable to the plaintiff, was insufficient as a matter of law and that all the evidence was insufficient in law to form the basis for a verdict for the plaintiff, respectively. The motions for direct verdict were denied. On April 30, 2012, the jury returned a verdict for Ms. Harper and against the Commonwealth on both counts awarding her $70,000.00 in compensatory damages and $375,000 in punitive damages.[2] The evidence when viewed in the light most favorable to the plaintiff reasonably warranted the jury finding the facts stated below.
The plaintiff, Colleen Harper, is a graduate of St. Mary’s High School and began working at the Registry of Motor Vehicles (“RMV”) in 1993, as a part-time Typist II. In 1994, she began working full-time in that capacity and was promoted several times until she became a Clerk Supervisor in 1999. From April 2002 through April 2007, she was Clerk V Supervisor in charge of the RMVs Chicopee branch. She was supervisor of five to six clerks. She received positive performance evaluations from her supervisors repeatedly throughout her career with the RMV and was viewed by her supervisors as a knowledgeable, conscientious, loyal and dedicated employee.
Thomas Manning began working at the RMV in 2001 as an Auditor I and for the EOT in 2005 in the same capacity. In September 2007, he was promoted to Auditor II. The auditors’ responsibilities include auditing the work of clerks at the RMV to check for errors. In that capacity, Mr. Manning oversaw the accuracy of Ms. Harper’s work and submitted audit reports to her direct supervisors.
Beginning in early 2006, Mr. Manning started making crude and vulgar remarks to Ms. Manning when the two were alone in the Chicopee office. Ms. Harper would arrive at the office between 7:30 AM and 7:45 AM to make sure that the office was ready to open at 8:30 AM. Other clerks usually arrived at about 8:25 AM. Oftentimes, Mr. Manning would be waiting outside the office when Ms. Harper arrived and would go into the office with her. During these times when they were alone, Mr. Manning often made comments to Ms. Harper regarding having had oral sex with his wife. He would also refer to female genitalia in crude language to Ms. Harper. Mr. Manning also made references to Ms. Harper’s breasts. Ms. Harper was offended and did not encourage Mr. Manning to make the remarks to her. Instead, she responded by telling him to stop. Mr. Manning’s activity in this regard continued.
Ms. Harper complained to her immediate supervisors in the Springfield RMV office, Cathy Sparks and Donna Brown, numerous times about Mr. Manning’s sexually-related conduct. Ms. Harper was told by Ms. Sparks, that it was just ‘Tom being Tom.” As the activity continued, Ms. Harper found it increasingly difficult to be in Mr. Manning’s presence and at times felt physically ill being around him. When he was in the Chicopee office conducting audits, he often interrupted the clerks as they were attending to customers and was disruptive to the flow of business in the office.
At the office Christmas parly in 2006, Mr. Manning said in Ms. Harper’s presence that he was getting new breasts for his wife for Christmas. Mr. Manning also made comments in the office to Ms. Harper that “your headlights are on” referring to Ms. Harper’s breasts. Sometime in the spring 2007, while retrieving an item from a file cabinet at the Chicopee office, Mr. Manning *563 was crouched behind Ms. Harper’s desk in such a way that when Ms. Harper moved from her desk his face came in contact with her crotch. Ms. Harper was upset by all of these occurrences and continued to complain about Mr. Manning’s conduct.
In March 2007, Mary Ellen Tacy, an RMV clerk, was reassigned to Chicopee to fill in for two weeks. During that time, while she was in the break room having Oreo cookies and milk, Mr. Manning made a comment to her to effect of having had something similar on his upper lip when he “went down on [his] wife last night. ” Ms. Tacy told him he was disgusting and that she would call her cousin who is a lawyer if he continued. Ms. Tacy’s reaction was overheard by Belinda Houldston, another worker in the office. Ms. Tacy reported the comment to her supervisor, Ms. Harper. Ms. Harper immediately called Ms. Brown and told her in Ms. Tacy’s presence what had happened. Ms. Brown told Ms. Harper that Ms. Tacy would be returning to her usual post elsewhere and Ms. Harper would be coming to the Springfield office soon, so she should “let it go.” Ms. Houldston also overheard Ms. Harper around this time complaining that she was “sick of hearing about Tom’s sex life.” Shortly after these events, a crude sexual remark by Mr. Manning caused Ms. Harper became so upset that she shouted at Mr. Manning and abruptly left the office through the back door. After being gone for about five minutes, she returned and apologized to her workers who had heard her shouting at Mr. Manning and witnessed her abrupt departure.
Within weeks, Ms. Harper was transferred to the Springfield office in an equivalent capacity. Mr. Manning’s office was in the Springfield RMV. Ms. Harper had a desk at the back of the RMV and would see Mr. Manning every day. After Ms. Harper’s outburst in the Chicopee office and her last complaint to her supervisors about Mr. Manning’s behavior, he stopped making sexual comments and stopped speaking to her altogether. He would shut the door as she was about to come through it and would not move out the way when she needed to walk past. Ms. Harper complained to Ms. Brown and Ms. Sparks about Mr. Manning’s unprofessional conduct.
Ms. Harper did not know how much of her work was now being audited by Mr. Manning. Ms. Sparks told her that her name was now being cited over and over for many mistakes and she should attend retraining. Ms. Harper was unaware of all the errors Mr. Manning had found. She learned of mistakes attributed to her concerning not registering licensees to vote or not determining if licensees wished to be organ donors. The licensees, however, were sixteen years old and not able to be signed up for either. Mr. Manning was critical in his audit of her for other alleged errors as well. Ms. Harper felt Mr. Manning was singling her work out for undue scrutiny and was unnecessarily critical of her work. In June 2007, Ms. Harper complained of the treatment she was receiving. Also in June, Mr. Manning was preparing an unfavorable audit of Ms. Harper’s work. As a result of Mr. Manning’s increased scrutiny and unfavorable audit report, Ms. Harper was brought up on disciplinary charges in August 2007.
Ms. Harper left for vacation in August 2007, and upon returning was greeted by Mr. Manning reciting to her “money is the root of all evil.” She immediately learned that she was being accused of (1) stealing because of failing to record a $170 cash payment from a customer and (2) failing to follow protocol in granting a temporary identification card to a customer on behalf of the customer’s absent relative. Ms. Harper denied intentional wrongdoing regarding the case and maintained that the protocol for granting such identification cards was often disregarded by registry clerks. Upon receiving the written allegations against her, Ms. Harper spoke to Ms. Sparks and Joseph O’Neill, RMVs Western Massachusetts District Manager. Angry, Ms. Harper said the allegations were “bullshit” and asked why no one had told her of these before. Ms. Sparks said she knew. Mr. O’Neill said nothing. Ms. Harper was asked to turn over her keys and badge which she did. She left angry, confused and upset.
Ms. Sparks called Ms. Harper the following Tuesday. Ms. Sparks told Ms. Harper that she needed to fight the complaint and that Mr. Manning was sabotaging her work. Ms. Sparks concluded by saying she and Mr. O’Neill were “pulling for [her].”
A disciplinary hearing on the matter was held in Boston on August 17, 2007, before Christopher Groll, Assistant General Counsel for EOT and designated Sexual Harassment Officer. At the hearing, Ms. Harper reported to Mr. Groll that she had been sexually harassed by Mr. Manning and that he was retaliating against her for reporting him. Mr. Groll informed her that he understood she had been working in a “hostile environment.” He directed her to submit a detailed written account of her complaint, which she did. Mr. Groll also told Ms. Harper that she would be fired if she did not voluntarily resign immediately. Despite EOTs Sexual Harassment Policy’s requirement to investigate, no further investigation was conducted into Mr. Manning’s conduct. Mr. Manning was never disciplined and he received a promotion one month later. Ms. Harper signed a separation agreement and resigned from her job at the disciplinary hearing on August 17, 2007.
DISCUSSION
Judgment Not Withstanding the Verdict and Motion for New Trial
A party who has previously moved for a directed verdict and been denied may then move for judgment notwithstanding the verdict “[n]ot later than 10 days after entry of judgment.” Mass.R.Civ.P. 50(b). Judgment notwithstanding the verdict “should be granted cautiously and sparingly, and should only be granted if the trial judge is satisfied that the jury failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.” Netherwood v. Am. *564 Fed’n of State, County & Mun. Employees, Local 1725, 53 Mass.App.Ct. 11, 20 (2001) (internal quotation omitted). When deciding a “defendant’s motion for judgment notwithstanding the verdict, the judge’s task, taking into account all of the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.” DeSantis v. Commonwealth Energy Sys., 68 Mass.App.Ct. 759, 762 (2007) (internal quotations omitted).
Massachusetts Rule of Civil Procedure 59(a)(1) “permits the granting of a new trial in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the Commonwealth.” Allowance of a new trial is within the trial court’s discretion. Commonwealth v. Johnson Insulation, 425 Mass. 650, 668 (1997). The trial judge may grant a motion for a new trial “if the weight of the evidence suggests that the verdict was based on bias, misunderstanding, or prejudice.” Cicarelli v. School Dep. of Lowell, 70 Mass.App.Ct. 787, 791 (2007). The judge must necessarily consider the probative force of the evidence and not merely the presence or absence of any evidence upon a disputed point. Phachansiri v. City of Lowell 35 Mass.App.Ct. 576, 579-80 (1983).
The evidence in this case consisted of testimony from approximately thirteen witnesses together with thirly-six exhibits that were entered in evidence. The main evidence was testimonial. From the verdict, it is clear that the jury rejected the testimony of some witnesses and accepted the testimony of others. Determining the credibility of witnesses is the province of the juiy and a judge is not to weigh the believability of the evidence, but rather is to ascertain whether there was evidence before the jury which reasonably could have led to the verdict rendered. McCormack v. Boston Edison Co., 423 Mass. 652 (1996).
The evidence, here, was sufficient to warrant a rational trier of fact in concluding that the Commonwealth knew or should have known of the sexual harassment Ms. Harper was being subjected to and that it failed to take steps to remedy it. There was ample evidence that (1) Mr. Manning repeatedly sexually harassed Ms. Harper over the course of several months in the Chicopee RMV, (2) Ms. Harper repeatedly complained about it to her supervisors, and (3) the supervisors refused to take any action to investigate her complaints or stop the harassment.
At trial, the defendants argued unsuccessfully that there was insufficient evidence as a matter of law to support the theory that Mr. Manning had supervisory authority over Ms. Harper. For the same reasons expressed then, the argument is unavailing. The evidence was that Mr. Manning’s position as auditor provided him with the responsibility and power to evaluate and monitor Ms. Harper. Because Mr. Manning had the authority to and did generate audits which were critical of her performance and accused her of violating department policy, Mr. Manning had the power to affect the terms and conditions of Ms. Harper’s employment. Accordingly, the jury was warranted in finding that he had supervisory authority over her. For these reasons, the defendant is not entitled to a judgment notwithstanding the verdict or a new trial on the sexual harassment claims.
The evidence at trial also supported a rational trier of fact in concluding that Ms. Harper was the object of retaliation by Mr. Manning in that he began to single her out for increased scrutiny after she became upset with him and complained about him. Further, once Ms. Harper reported the harassment to the designated Sexual Harassment officer, action on her termination was not suspended pending an investigation of her claims, but rather she was required to either sign a separation agreement on the spot orbe fired. The jury could reasonably have found that Ms. Harper, who was a satisfactorily performing employee for fifteen years, was retaliated against by being forced to resign for claimed errors discovered by her harasser after she exposed him. The jury had before it evidence that supports the conclusion that despite years of satisfactory performance, after Ms. Harper confronted Mr. Manning and complained of him, her work was examined more closely and she was treated more harshly for violations of agency protocol that were common practice by other employees.
For these reasons, as well as those advanced in the plaintiffs opposition, the defendant is not entitled to judgment notwithstanding the verdict or a new trial on the retaliation claims.
Remittitur on Compensatory Damages
On a motion for remittitur, a Court may disturb an award of compensatory damages only if it was unsupported by substantial evidence in the record such that it is “greatly disproportionate to the injury proven or represented a miscarriage of justice.” Labonte v. Hutchins & Wheeler, 424 Mass. 813, 825 (1997). A judge has broad discretion to act on a motion for a remittitur. Baudanza v. Comcast of Mass. I, Inc., 454 Mass. 622, 630 (2009). ‘The judge is not obliged to make the smallest modification possible; the judge has thé discretion to bring the verdict anywhere within the range of verdicts supported by the evidence. ” Id., citing D’Annolfo v. Stoneham Hous. Auth., 375 Mass. 650, 662 (1978). When the Court grants remittitur, the plaintiff is given the option of either accepting a new trial or accepting the amount of damages that the Court considers fair. Mass.R.Civ.P. 59(a); Tower v. Hirschhorn, 397 Mass. 581, 589 (1986).
Here, the jury’s verdict granting compensatory damages in the amount of $70,000 was unsupported by substantial evidence in the record. Based on the evidence presented, the compensatory damages should be measured by the wages lost by the plaintiff as a result of the wrongful termination, as discussed below.
*565 At the time of her termination, on August 17, 2007, Ms. Harper was earning $868.80 per week. Despite her efforts to find work, she remained unemployed for thirty-seven weeks, until April 2008, when she was hired by Balise Honda at a salary of $580.00 per week, $288.80 per week less than her salary at the RMV. She remained at that salary for twelve weeks. Accordingly, she had lost earnings of $32,145.60 and reduced earnings of $3,465.60 for this period. After twelve weeks, Ms. Harper received a raise to $780.00 per week. Her lost earnings for this period total $8,080.80. Accordingly, Ms. Harper’s total lost and reduced earnings for the period from August 17, 2007 through April 19, 2010 total $43,692.00.
In mid-April 2010, after ninety-one months, Ms. Harper’s salary was raised to $24.00 per hour or $960.00 per week, $91.20 per week more than her salary at the RMV. At the beginning of 2012, her salary was reduced to between $21 and $22 per hour, a reduction of two to three dollars per hour. The total increase in salary during the eighty-eight weeks from 2010 to 2012 was $8,025.60 over her salary at the RMV. Based on the testimony of her earnings, a net back pay award, deducting $8,025.60 from $43,692.00 for a total of $35,666.40, was justified. Based on the evidence presented, the total of $35,666.40 in compensatory damages is warranted.
Remittitur on Punitive Damages
Compensatory damages make a plaintiff whole for the actual harm he or she has suffered while punitive damages are only appropriate “where a defendant’s conduct warrants condemnation and deterrence.” Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 17 (1998). In employment discrimination cases, the plaintiff, in order to collect punitive damages, must prove that the defendant’s conduct was “outrageous or egregious.” Haddad, v. Wal-Mart Stores, Inc., 455 Mass. 91, 110 (2009). Trial courts must review punitive damages to assure that they are not excessive or irrational, in light of the following three factors: (1) the degree of reprehensibility; (2) the ratio of the punitive damage award to the “actual harm inflicted on the plaintiff’; and (3) the comparison with civil or criminal penalties that could be imposed for comparable misconduct. Labonte, 424 Mass. at 826-27; Bain v. City of Springfield, 424 Mass. 758, 768 (1997).
The jury’s award of $375,000 in punitive damages must be measured in view of the factors stated above. The degree of reprehensibilfiy in this case is best measured by viewing the conduct of Mr. Manning and the response of the supervisors to Ms. Harper’s complaints. Ms. Harper was subjected to repeated unwelcome remarks of a particularly graphic, crude and vulgar nature. She did not engage in conduct that would have suggested these remarks were anything but offensive to her. The conduct continued unremittingly for ten months, despite Ms. Harper’s repeated complaints to her superiors.
The vast maj ority of clerical workers in the RMV offices involved are women. Mr. Manning as an auditor was in a position to affect the evaluation of each clerical worker whose work he audited. In Ms. Harper’s case, he used that position as an opportunity to harass her and to retaliate against her for her unwillingness to be continually subjected to his sexually explicit remarks or to allow those under her supervision to be. The response of her supervisors to her repeated and detailed complaints was to dismiss Mr. Manning’s conduct as something to be tolerated in the workplace. The anemic reaction to Ms. Harper’s situation merits deterrence that would discourage a like response in the future.
Moreover, once the complaint was made, it was Ms. Harper who became the focus of investigation and ultimately termination. The complaint having been made to the individual charged with addressing sexual harassment, the agency’s sexual harassment policy should have been followed. Instead, no investigation was undertaken and Ms. Harper’s resignation was pressed for immediately. The jury was warranted in arriving at the figure it did based on the conduct of the parties. Accordingly, the punitive damages will stand.
Motion to Amend Judgment
The Commonwealth is correct that the judgment should be amended to reflect the fact that interest on compensatoiy damages runs from the date of the filing of the complaint, April 3, 2009, but interest on punitive damages runs from the date of judgment, April 20, 2012. The appropriate adjustment is to be made based on those dates.
Motion for Attorneys Fees and Costs
The legislature has authorized the award of attorneys fees in certain actions under several statutory provisions, including under G.L.c. 151B, section 9. ‘The court must ensure that any . . . award of fees is reasonable.” Eastern Holding Corp., 74 Mass.App.Ct. at 744. See also First Natl Bank of Boston v. Brink, 372 Mass. 257, 264 (1977); T&D Video, Inc. v. City of Revere, 66 Mass.App.Ct. 461, 476 (2006) (“[w]here the tried judge allows a fee petition to a prevailing parly, the amount allowed must be reasonable”); WHTR Real Estate Ltd. Partnership v. Venture Distrib., Inc., 63 Mass.App.Ct. 229, 235 (2005).
The Court has discretion in determining whether the amount of attorneys fees sought is reasonable. Cummings v. National Shawmut Bank of Boston, 284 Mass. 563, 568 (1934); Citizens Bank of Mass. v. Travers, 69 Mass.App.Ct. 174, 176 (2007). The “basic measure” of a reasonable statutory attorneys fee award is the lodestar method, under which the number of hours reasonably spent on the case is multiplied by a reasonable rate. Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993). Under the lodestar method, several formally separate considerations or factors come indirectly into play, including (1) the issues presented and the nature of the claim giving rise to the right to attorneys fees, (2) the time and labor required, (3) the amount of damages *566 involved, (4) the result obtained, (5) the experience, reputation and ability of the attorney, (6) the usual price charged for similar services by other attorneys in the same area, and (7) the amount of awards in similar cases. Berman v. Linnane, 434 Mass. 301, 303 (2001); Linthicum v. Archambault, 379 Mass. 381, 388 (1979), abrogated on other grounds by Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 418 Mass. 737 (1994); Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 445 Mass. 411 (2005); Howe v. Tarvezian, 63 Mass.App.Ct. 10 (2008). “Neither the time spent nor any other single factor is necessarily decisive of what is to be considered as a fair and reasonable charge for such services.” Cummings v. National Shawmut Bank, 284 Mass. 563 (1934).
The party seeking an award of fees “bears the burden of documenting in detail the hours expended and of establishing the market rate.” T&D Video, Inc., 66 Mass.App.Ct. at 477. See also Society of Jesus of New England v. Boston Landmarks Comm’n, 411 Mass. 754, 759 n.11 (1992). “Calculation of reasonable hourly rates should begin with the average rates in the attorney’s community for similar work by attorneys of the same years’ experience.” Stratos v. Department of Pub. Welfare, 387 Mass. 312, 323 (1982).
The nature of the case and the issues presented are complex. Employment discrimination claims based on sexual harassment require a thorough understanding of a discrete, nuanced, and complex area of the law. The time spent in preparation often involves obtaining and reviewing documentation of a plaintiffs entire work, medical and financial histories. Discovery practice is time-consuming and robust in such cases. Trial preparation involves meticulous attention to detail. The case at hand is no different. The amount of time documented and spent in bringing this case to trial is reasonable for a case of this type and magnitude. The compensatoiy damages here were not extraordinarily high, but the punitive damages were impressively high. The plaintiff prevailed on all claims she asserted.
The reasonable hourly rate is determined by what the attorney’s services were objectively worth, not what she usually charges. Haddad v. Wal-Mart Stores, Inc., 455 Mass. 1024 (2010). Here, counsel has submitted affidavits in support of the attorneys fees requested, including an affidavit summarizing his and his associates’ backgrounds, education and experience and two affidavits from local counsel stating the hourly rate usually charged by comparable attorneys in the area. The defendant contends that the rate charged by the attorneys and the paralegals is unreasonably high.
The Court finds based on counsels’ impressive qualifications, experience, reputation and skills and based on the Court’s own observation of Mr. Minoff s trial skills, the rate of $300.00 per hour is a fair and reasonable amount for each. Ms. Rapinchuk is an attorney known to the Court and the affiants to be of equal caliber, experience and background and should be compensated at a commensurate rate. Mr. Baxley was admitted to the Massachusetts bar in 2006. He has an expertise in the area of employment law, having been an MCAD staff attorney previously. The rate of $225.00 per hour is reasonable. The rate of $100 per hour paid to paralegals is reasonable for the work done in this area of the law and in this legal community.
The defendant also contests certain of the costs charged in the matter as not allowable, such as postage, photocopying, courier services, overnight mail, telephone, computer research and travel. The court has subtracted from the expenses claimed amounts for the following because, in the Court’s view, these items either are in the nature of law firm overhead, and constitute part of the justification for hourly rates at the level sought, or are not adequately accounted for: “copying costs,” “Premiere Global Services-Re Conference Call,” “Petty Cash-travel and expenses-Holyoke,” “Fed/Ex-Federal Express/Ground Services,” “Lexis/Westlaw Research,” “Trial Exhibits” and ‘Trial Exhibits-Fed/Ex,” “postage/ovemight/courier,” and “legal research.”
Accordingly, costs are established at $3,757.52. Reasonable attorneys fees are allowed in the total amount of $93,592.50 plus paralegal fees of $4,200.00 for a total of $97,792.50 in professional fees.
CONCLUSION
For the reasons stated above:
(1) defendants’ motion for judgment notwithstanding the verdict, or alternatively, motion for a new trial is DENIED;
(2) the defendants’ motions to amend judgment is ALLOWED and interest on compensatory damages will be calculated from April 3,2009, and interest on punitive damages will be calculated from April 20, 2012;
(3) the defendants’ motion for remittitur is DENIED as to punitive damages and ALLOWED insofar as the amount of compensatory damages is reduced to $35,666.40. The plaintiff has thirty days from the date of this Order to inform the Court in writing as to whether she accepts the reduced amount of damages. If she accepts this reduced damage award, a new judgment shall be issued reflecting the reduction. If she rejects this reduced damage award, then the Motion for a New Trial shall be deemed allowed as to the issue of compensatory damages only, and a new trial shall be conducted on that limited issue; and
(4) the plaintiffs motion for attorneys fees and costs is ALLOWED and attorneys fees and costs together are awarded in a total amount of $101,550.02.

 Ms. Harper’s suit against Mr. Manning was settled before trial.